**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Stacey M. Kaplan (Bar. No. 241989)
skaplan@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Joseph H. Meltzer (*pro hac vice* forthcoming)
jmeltzer@ktmc.com
Darren J. Check (*pro hac vice* forthcoming)
dcheck@ktmc.com
Terence S. Ziegler (*pro hac vice* forthcoming)
tziegler@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiff and the Proposed Class*
*[Additional Attorneys Listed on Signature Page]*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS LOCAL 690 HEALTH PLAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS U.S.A., INC., TAKEDA PHARMACEUTICALS AMERICA, INC., TWI PHARMACEUTICALS INC., and TWI PHARMACEUTICALS USA, INC.,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL ANTITRUST LAWS AND VARIOUS STATE LAWS**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  JURISDICTION AND VENUE .............................................................................2

III. INTRADISTRICT ASSIGNMENT .......................................................................3

IV.  PARTIES ................................................................................................................3

    A.   Plaintiff ........................................................................................................3

    B.   Defendants ...................................................................................................4

V.   REGULATORY FRAMEWORK ............................................................................5

    A.   The Regulatory Regime Governing Approval and Substitution of Generic Drugs ............5

        1.   The Hatch-Waxman Amendments..........................................................6

        2.   Regulatory Exclusivities Applicable to New Drugs .............................7

        3.   The First ANDA Filer's Exclusivity Period .........................................8

        4.   Patents are Subject to Judicial and Administrative Scrutiny ...............10

    B.   Generics, Including Authorized Generics, Drive Down Prices For Purchasers Quickly and Dramatically ........................................................12

        1.   The first AB-rated generic is priced below the brand...........................13

        2.   Later generics drive prices down further ..............................................14

        3.   Authorized Generics, Like Other Generics, Compete on Price ............14

    C.   Manipulation of the Regulatory Structure to Impair Competition.....................16

    D.   No-AG Agreements Provide a Means for Brand and Generic Manufacturers to Share the Gains from Conspiring .....................18

VI.  FACTUAL ALLEGATIONS ................................................................................22

    A.   Development and Approval of Dexilant ....................................................22

    B.   Takeda's Patents and Orange Book Listings, and Generic Manufacturers' ANDA Filings ...........................................................23

    C.   Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial Rulings .......................................................26

        1.   Litigation Concerning the '282, '755, '058, '275, '971, and '668 Patents...........26

2. Litigation Concerning the '158 and '187 Patents ................................29

D. Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial ......................33

E. Takeda's Settlement with TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation from Takeda ........................34

F. Takeda Entered into Other Alleged Improper Agreements with Would-Be Competitors During this Same Time Period ........................36

G. Defendants' Agreement Would Remain Illegal Even if Takeda Retained the Right to Launch an AG or Received Royalties from TWi ........................37

H. Without Defendants' Agreement, Two Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020, or Earlier ........................38

VII. MARKET POWER AND DEFINITION ........................40

VIII. INTERSTATE AND INTRASTATE TRADE AND COMMERCE ........................42

IX. ANTITRUST IMPACT ........................43

X. CLASS ACTION ALLEGATIONS ........................44

XI. CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT ........................47

XII. CLAIMS FOR RELIEF ........................48

XIII. ADEQUATE REMEDIES AT LAW ........................82

XIV. DEMAND FOR JUDGMENT ........................82

XV. JURY DEMAND ........................83

Plaintiff Plumbers Local 690 Health Plan brings this action, individually on behalf of itself and as a class action on behalf of all others similarly situated, against defendants Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals America, Inc. (collectively, "Takeda") and TWi Pharmaceuticals, Inc., and TWi Pharmaceuticals USA, Inc. (collectively, "TWi") (together "Defendants"). The allegations contained herein are based on personal knowledge as to Plaintiff and upon information and belief as to all other topics.

## I.    INTRODUCTION

1.    This civil action seeks treble damages and injunctive relief to address Defendants' anticompetitive scheme to delay generic competition for Dexilant, Takeda's prescription dexlansoprazole drug product that is used for the treatment of erosive esophagitis and symptoms of gastroesophageal reflux disease ("GERD").

2.    Plaintiff seeks overcharge damages arising from Takeda's agreement with competing generic manufacturer TWi to end its challenge to Takeda's patents for Dexilant and delay the launch of its generic version of Dexilant in exchange for payments from Takeda.

3.    Takeda's payment to TWi included both a cash payment of $9.5 million as well as a *de facto* agreement that Takeda would not launch an authorized generic version of Dexilant to compete when TWi eventually launched a generic version of the drug.

4.    Defendants' anticompetitive conduct delayed competition in the market for brand and generic Dexilant in the United States and its territories from June 2020, to January 2022.

5.    Additionally, Defendants' anticompetitive conduct further restricted the market for brand and generic Dexilant in the United States and its territories by limiting competition to a single generic for nearly a year after the launch of an authorized generic version of Dexilant by TWi, as, pursuant to its agreement with TWi, Takeda refrained from launching its own authorized generic version of Dexilant, which would have resulted in lower prices for purchasers including Plaintiff and the Class (defined below).

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law and fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the class, and at least one member of the putative class is a citizen of a state different from that one of the Defendants.

7.    The Court also has jurisdiction over this action pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337, as this action alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, that are actionable under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has jurisdiction over the claims under the various state laws under both 28 U.S.C. § 1332(d) and 28 U.S.C. § 1367(a).

8.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), as this Complaint brings claims for violations of the federal antitrust laws against Defendants, a substantial part of the events giving rise to the claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

9.    This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in California and in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in California and in this District. Moreover, Takeda sued TWi twice in this District for infringement of the patents at issue in this litigation. *See Takeda Pharmaceuticals Co. Ltd., et al. v. TWi Pharmaceuticals, Inc.*, No. 3:11-cv-1609 (N.D. Cal.); *Takeda Pharmaceuticals Co. Ltd., et al. v. TWi Pharmaceuticals, Inc.*, No. 5:13-cv-2420 (N.D. Cal.). In that patent litigation, neither Defendant contested personal jurisdiction.

### III.    INTRADISTRICT ASSIGNMENT

10.    Pursuant to Northern District of California Local Rules 3-2(d) and 3-5(b), this action is filed in the San Francisco Division of the Northern District of California, where the underlying patent litigation described herein took place, where Defendants transact significant business, and where at least five related cases—*Walgreen Co., et al. v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 3:25-cv-02785-JSC (N.D. Cal.); *KPH Healthcare Services, Inc. v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 3:25-cv-02966-JSC (N.D. Cal.); *SuperValu, Inc. v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 3:25-cv-03189-JSC (N.D. Cal.); *Sergeants Benevolent Association Health & Welfare Fund v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 3:25-cv-03319-JCS (N.D. Cal.), and *Uniformed Fire Officers Association Family Protection Plan Local 854, et al. v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 4:25-cv-03341-JCS (N.D. Cal.)—are pending.

### IV.    PARTIES

#### A.    Plaintiff

11.    Plaintiff Plumbers Local 690 Health Plan is a health benefit plan headquartered and with a principal place of business in Philadelphia, Pennsylvania. Plaintiff is a tax-exempt, non-profit organization and a self-insured employee welfare plan, as that term is used in the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff provides health benefits, including prescription drug benefits, to its participants, plus their spouses and dependents. During the Class Period (defined below), Plaintiff purchased and/or provided reimbursement for some or all of the purchase price for brand and generic Dexilant, other than for re-sale, at supracompetitive prices and has thereby been injured. In addition, there is a substantial probability that Plaintiff will in the future purchase and/or provide reimbursement for brand and/or generic Dexilant, other than for re-sale. Plaintiff paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices for brand and generic Dexilant and allocate markets and customers for these products. As a result of Defendants' wrongful conduct, Plaintiff was injured in its business or property.

**B.    Defendants**

12.    Defendant Takeda Pharmaceutical Company Limited ("Takeda Japan") is a Japanese corporation having its global headquarters and a principal place of business at 1-1, Nihonbashi-Honcho 2-Chome, Chuo-ku, Tokyo 103-8668, Japan. Takeda Japan owns and controls Takeda Pharmaceuticals U.S.A., Inc., ("Takeda U.S.A.") and Takeda Pharmaceuticals America, Inc. ("Takeda America"). Takeda Japan, Takeda U.S.A., and Takeda America were all parties to the unlawful settlement agreement with TWi.

13.    Takeda U.S.A. and Takeda America's current principal place of business is at 95 Hayden Avenue, Lexington, Massachusetts 02421. Takeda has other operations in the United States located near Chicago, Illinois, and in San Diego, California. Takeda's office in San Diego is "home to [its] global research site focused on gastroenterology and neuroscience" that houses over 250 employees and includes four research platform groups: structural biology, early target discovery, computational biology, and biologics.[1] Takeda notes that "[t]he San Diego life sciences cluster, a major driver of the region's economy, is home to approximately 1,200 life sciences companies and 80 research institutes—an ecosystem Takeda is proud to be a part of."[2] Takeda also operates a vertically integrated bioprocessing plant in Thousand Oaks, California, with over 25 years of manufacturing experience.[3] In 2021, Takeda invested $126 million to expand this facility, adding a new 15,000-square-foot manufacturing area and enhancing an existing 14,000-square-foot space.[4] And in June 2024, Takeda announced a $230 million

---

[1] *Research & Development*, Takeda, https://www.takeda.com/en-us/what-we-do/research-and-development/ (last visited Apr. 22, 2025); Press Release, Takeda, *Takeda Opens New Global Research Center in San Diego* (Apr. 30, 2019), https://www.takeda.com/enus/newsroom/news-releases/2019/takeda-opens-new-global-research-center-in-san-diego/.
[2] *Research & Development*, supra Note 1.
[3] *For Takeda employees in Thousand Oaks, Every Vial Has a Name*, Takeda, https://jobs.takeda.com/thousandoaks (last visited Apr. 22, 2025).
[4] Fraiser Kansteiner, *Takeda lays out $126M to tap robotics, virtual reality and more at California production site*, Fierce Pharma (July 23, 2021), https://www.fiercepharma.com/manufacturing/takeda-lays-out-126m-to-tap-robotics-virtual-reality-and-more-at-california.

expansion of its Los Angeles manufacturing facility located at 4501 Colorado Blvd., near Glendale, which aims to increase the production capacity and is expected to create over 125 new jobs.[5]

14.     Defendant TWi Pharmaceuticals, Inc. ("TWi Pharmaceuticals") is a Taiwanese corporation having a principal place of business at 3F., No. 41, Ln. 221, Gangqian Rd., Neihu Dist., Taipei City 114, Taiwan (R.O.C.). TWi Pharmaceuticals owns and controls TWi Pharmaceuticals USA, Inc. ("TWi USA"), with its principal place of business located at 115 West Century Road, Suite 135, Paramus, New Jersey 07652.

15.     All of Defendants' wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

## V.     REGULATORY FRAMEWORK

### A.     The Regulatory Regime Governing Approval and Substitution of Generic Drugs

16.     Under the federal Food, Drug, and Cosmetic Act ("FDCA"),[6] manufacturers that create a new drug must obtain approval from the United States Food and Drug Administration ("FDA") to sell the product by filing a New Drug Application ("NDA").[7] An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[8]

17.     When the FDA approves a brand manufacturer's NDA, the manufacturer may list in *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the Orange Book) patents that claim the drug or a method of using the drug, and that reasonably be enforced against a generic

---

[5] Press Release, Takeda, *Takeda Invests 230 Million US Dollars in Expanding Production Capacity for Plasma-Derived Therapies at Los Angeles Manufacturing Site* (June 11, 2024) https://www.takeda.com/en-us/newsroom/news-releases/2024/expanding-production-capacity-for-PDT-at-LA-manufacturing-site/.
[6] Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301 *et seq*.).
[7] 21 U.S.C. §§ 301-392.
[8] 21 U.S.C. § 355(a), (b).

manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents.[9] The manufacturer may list in the Orange Book within 30 days of issuance any patents issued after the FDA approved the NDA.[10] Valid and infringed patents may lawfully prevent generic competition, at least for a period, but manufacturers can abuse the system to use invalid or non-infringed patents to unlawfully delay generic competition.

18.    In listing patents in the Orange Book, the FDA merely performs a ministerial act. The FDA relies completely on the brand manufacturer's truthfulness in submitting patents for listing, as it does not have the resources or authority to verify the manufacturer's patents for relevance or validity.

19.    As described below, when a patent is properly listed in the Orange Book, a brand manufacturer may sue a generic company for infringing that patent before the generic product is sold. If it does, the FDA cannot approve the generic manufacturer's drug application for a period of two and a half years.

### 1.    The Hatch-Waxman Amendments

20.    The Hatch-Waxman Amendments, enacted in 1984, simplified regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.[11] A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA and must show that the generic contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug and that it is bioequivalent. The FDA assigns a generic that meets these criteria relative to its brand counterparts an "AB" rating, and a generic that has received this rating is referred to as an "AB-rated generic."

21.    The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and

---

[9] Not all patents may be listed in the Orange Book. For example, patents covering processes for making drug products may not be listed.

[10] 21 U.S.C. § 355(b)(1), (c)(2).

[11] *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355).

CLASS ACTION COMPLAINT
CASE NO.:

identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic is present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart.[12]

22.    Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

23.    The Hatch-Waxman Amendments achieved both goals, advancing the rate of generic product launches substantially and ushering in an era of historically high profit margins for brand pharmaceutical manufacturers. In 1983, before the Hatch-Waxman amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, revenues for brand and generic prescription drugs totaled $21.6 billion; by 2013, total prescription drug revenues had climbed to more than $392.2 billion, with generics accounting for 86% of prescriptions.[13] Generics are dispensed about 95% of the time when a generic form is available.[14]

### 2.    Regulatory Exclusivities Applicable to New Drugs

24.    To promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman Amendments also provide for exclusivities (or exclusive marketing rights) for new drugs. The FDA grants any such exclusivities upon approval of a drug if the sponsor and/or drug meet the relevant statutory requirements. Exclusivities applicable for a given drug are listed in the Orange Book, along with any applicable patents, and these exclusivities can run concurrently with the listed patents.

25.    One such exclusivity, the New Chemical Entity ("NCE") exclusivity, applies to products containing chemical entities never previously approved by the FDA, either alone or in combination. If a product has received an NCE exclusivity, the FDA may not accept any ANDA for a drug containing the

---

[12] 21 U.S.C. § 355(j)(8)(B).

[13] *See* Murray Aitken, Michael Kleinrock, Jennifer Lyle, Lauren Caskey, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013*, IMS Institute for Healthcare Informatics 30, 51 (2014).

[14] *Id.*

same active moiety for review for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.[15]

26.    A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application. If this exclusivity is granted, the FDA may not approve an ANDA for that drug for three years from the date on which the supplemental application is approved.[16]

27.    Regulatory exclusivities are not always absolute bars to generic entry. For example, some regulatory exclusivities can be overcome by carving out information in the label for a generic or for other reasons.[17]

### 3.    The First ANDA Filer's Exclusivity Period

28.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

  a.    That no patent for the brand has been filed with the FDA (a "paragraph I certification");

  b.    That any patent(s) for the brand has/have expired (a "paragraph II certification");

  c.    That any patent(s) for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

  d.    That any patent(s) for the brand is/are invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").[18]

29.    When a generic manufacturer has filed a paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of

---

[15] 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).
[16] 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).
[17] *See, e.g.*, 21 C.F.R. §§ 314.94(a)(8)(iv), 314.127(a)(7); 21 U.S.C. § 355a(o).
[18] 21 U.S.C. § 355(j)(2)(A)(vii).

receiving notification of the paragraph IV certification, the FDA will not grant the final approval that the ANDA needs to market and sell its product until the earlier of (i) the passage of 30 months, or (ii) the issuance of a decision by a court that the patent(s) at issue is/are invalid or not infringed by the generic manufacturer's ANDA.[19]  Until one of those conditions occurs, the FDA may only grant tentative approval, which indicates that the ANDA meets all regulatory requirements and is approvable but for the thirty-month stay.

30.    To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the generic manufacturer that submitted the first ANDA containing paragraph IV certifications (the "first-filer") a 180-day exclusivity period to market the generic version of the drug; the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug during that time.[20] That is, when a first-filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand are either invalid or not infringed by the generic, the FDA cannot approve a generic manufacturer's subsequent ANDA until the first-filer's generic has been on the market for 180 days (unless the first-filer loses its 180-day exclusivity).

31.    The 180-day window is often referred to as the first filer's six-month or 180-day "exclusivity." Although the first-filer is shielded from competition from other ANDA filers during this period, it may still face competition from an authorized generic ("AG"), because a brand manufacturer can launch an AG at any time, manufacturing its AG in accordance with its approved NDA for the branded product but selling at a lower price point.

32.    An AG is the brand product, manufactured by the brand company, with a generic label. An AG is chemically identical to the brand drug but is sold as a generic, typically through either the brand manufacturer's subsidiary (if it has one) or through a third-party distributor. Brand manufacturers

---

[19] 21 U.S.C. § 355(j)(5)(B)(iii). This period is commonly called a "thirty-month Hatch-Waxman stay" or "thirty-month stay." The brand/patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the thirty-month stay of FDA approval, and must instead satisfy the showing required to obtain a preliminary injunction to prevent the generic launch.
[20] 21 U.S.C. § 355(j)(5)(B)(iv), (D).

frequently launch AGs in response to generic entry to recoup some of the sales they would otherwise lose. Nothing prohibits a brand company from launching its own AG while also licensing a third-party to distribute and sell an AG as well.

33.    The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first-filer.[21] This is particularly true when the brand company does not launch its own, competing AG.

34.    A first filer who informs the FDA that it intends to wait until all Orange Book-listed patents expire before marketing its generic does not qualify for a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

35.    A first-filer can forfeit its 180-day exclusivity by failing to obtain tentative approval from the FDA for its ANDA within 30 months of filing its ANDA.[22] A first-filer can also forfeit exclusivity as to any later filers when: (a) a later filer receives a final judgment that their proposed ANDA product either does not infringe the patents certified by the first filer or that such patents are invalid; and (b) the first filer fails to market before 75 days have passed since such judgment from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken.[23]

### 4.    Patents are Subject to Judicial and Administrative Scrutiny

36.    The existence of one or more patents purporting to cover a drug product does not necessarily mean that the patent owner will be able to use those patents to exclude competition from generics. A patent may be found to be invalid, not infringed, or unenforceable.

37.    Patents are routinely invalidated or held unenforceable, either upon reexamination or in *inter partes* proceedings by the U.S. Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

---

[21] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 144 (2013) (quoting C. Scott Hemphill, Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem, 81 N.Y.U. L. Rev. 1553, 1579 (2006)).
[22] 21 U.S.C. § 355(j)(5)(D)(i)(IV).
[23] 21 U.S.C. 355(j)(5)(D)(i)(I)(bb)(AA).

38.     A patent holder always bears the burden of proving infringement. One way that a generic can prevail in patent infringement litigation is to show that its product does not infringe the patent (and/or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

39.     A patent is invalid or unenforceable when, *inter alia*: (i) the disclosed invention is anticipated and/or obvious in light of earlier prior art; (ii) its claims are indefinite, lack sufficient written description, or fail to properly enable the claimed invention; (iii) an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iv) when a later acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).[24]

40.     In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

41.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[25] An empirical study of all substantive decisions rendered

---

[24] Other actions by the patentee, but less relevant here, can invalidate or otherwise render a patent unenforceable. While not an exhaustive list, such actions include failing to name the correct inventors, failing to adequately describe and claim the invention, and failing to pay the required maintenance fees to the PTO. Licenses and ownership transfers can render a patent unenforceable against a particular infringer, and laches and estoppel can apply when a patent holder delays bringing suit against a known infringer for too long. Lastly, the patent can be unenforceable because its term has expired.

[25] *Generic Drug Entry Prior to Patent Expiration: An FTC Study* at vi-vii, FTC (July 2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf.

in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[26]

42.     If a generic manufacturer successfully defends against the brand's infringement lawsuit—either by showing that its ANDA does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

### B.     Generics, Including Authorized Generics, Drive Down Prices For Purchasers Quickly and Dramatically

43.     Generic versions of brand drugs contain the same active ingredient(s) as the brand drug and are determined by the FDA to be just as safe and effective as their brand counterparts. The price is the only material difference between generics and their corresponding brand versions. Because generics are essentially commodities that cannot be therapeutically differentiated, the primary basis for competition between a brand product and its generic version, or between multiple generic versions, is price.

44.     Without AB-rated generics in the market, the manufacturer of a brand drug has a monopoly—every sale of the product, and the accompanying profit, benefits the brand manufacturer. Without AB-rated generic competition, brand manufacturers can, and routinely do, sell their drug for far more than the marginal cost of production, generating profit margins above 70% while making hundreds of millions of dollars in sales. The ability to command these kinds of profit margins is what economists call market power.

45.     Until a generic version of the brand drug enters the market, there is no bioequivalent drug to substitute for and compete with the brand, and the brand manufacturer can, therefore, continue to profitably charge supracompetitive prices. Brand manufacturers are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to extend their monopoly for as long as possible,

---

[26] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago).

sometimes resorting to any means possible—including illegal means—to delay or prevent generic competition.

46.     Since the passage of the Hatch-Waxman Amendments, every state has adopted drug product selection laws that either require or permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing.

47.     Generic competition greatly benefits payers of prescription drugs because they can (i) purchase generic versions of the drug at substantially lower prices and/or (ii) purchase the brand at a reduced price.

### 1.     The first AB-rated generic is priced below the brand

48.     Experience and economic research show that the first generic manufacturer to market its product prices it below its brand counterpart.[27] With the reduction in price and aided by state substitution laws, the first generic manufacturer almost always captures a large share of sales from the brand. The presence of a generic at a lower price reduces the average price for the drug (brand and generic combined).

49.     During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market. In the absence of competition from other generics, a first-filer generic manufacturer generally makes about 80% of all the profits that it will ever make on the product during that 180-day exclusivity period, a significant incentive for getting to market as quickly as possible.

---

[27] *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* at ii-iii, vi, 34, FTC, (Aug. 2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf ("FTC 2011 AG Study"); *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* at 8, FTC (Jan. 2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf ("FTC Pay-for-Delay Study").

50.     Once generic competition begins, it quickly captures sales of the corresponding brand drug, often 80% or more of the market within the first six months after entry.

### 2.     Later generics drive prices down further

51.     Once additional generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[28] The Federal Trade Commission ("FTC") found that on average, within a year of generic entry, generics had captured 90% of corresponding brand sales and (with multiple generics on the market) prices had dropped 85%.[29]

52.     According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two.

### 3.     Authorized Generics, Like Other Generics, Compete on Price

53.     An AG is a sold under the authority of the brand's NDA. An AG is chemically identical to the brand drug, but is sold as a generic.

54.     As discussed above, a brand manufacturer may market and sell (directly or indirectly) an AG at any time as well as to license another company to do so. This allows an AG to enter the market even during a first-filer's 180-day exclusivity period.

55.      The FDA has found that allowing brand manufacturers to introduce AGs during the 180-day exclusivity period is consistent with the "fundamental objective of the Hatch-Waxman [A]mendments" to encourage competition and, as a result, "lower prices in the pharmaceutical market."[30] The FDA reasoned that if a brand releases an AG at a reduced price during the 180-day exclusivity period, "this might reasonably be expected to diminish the economic benefit" to the generic first-filer by

---

[28] *See, e.g.*, Tracy Regan, *Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market*, 26 Int'l J. Indus. Org. 930 (2008); Richard G. Frank, *The Ongoing Regulation of Generic Drugs*, 357 New Eng. J. Med. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, 43 J.L. & Econ. 311 (2000).
[29] FTC Pay-for-Delay Study at 8.
[30] FDA, Opinion Letter re: Citizen Petition Docket Nos. 2004P-0075/CP1 & 2004P-0261/CP1 at 12 (July 2, 2004), https://www.regulations.gov/document/FDA-2004-P-0400-0003.

CLASS ACTION COMPLAINT
CASE NO.:

increasing competition and causing the generic to "reduc[e] the substantial 'mark-up' [generics] can often apply during the [180-day] period."[31]

56.    This competition, and the lower prices that result from it, benefits drug purchasers.

57.    Brand manufacturers recognize the significant economic advantages of releasing their AGs to compete with the first-filer generic during the 180-day exclusivity period. One study noted that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[32]

58.    Competition from an AG substantially reduces drug prices and the revenues of the first-filer generic (especially during the 180-day exclusivity period).

59.    The cost-lowering effect of an authorized generic on the first AB-rated generic is widely recognized by both brand and generic pharmaceutical companies.[33]

60.    A study analyzing three examples of AGs found that "[f]or all three products, authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[34]

---

[31] *Id.*

[32] Kevin A. Hassett & Robert J. Shapiro, Sonecon, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals* (May 2007), https://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf.

[33] For example, one generic manufacturer quantified the fiscal consequences of competing with an authorized generic and determined that the authorized generic reduced its first generic's revenues by two-thirds, or by approximately $400 million. Comment of Apotex Corp. in Support of Mylan Citizen Petition Docket No. 2004P-0075/CP1 at 4, (Mar. 24, 2004), https://web.archive.org/web/20041216115511/http://www.fda.gov/ohrms/dockets/dailys/04/apr04/040204/04P-0075-emc00001.pdf. Commenting on an FDA Citizen Petition by drug manufacturer Teva Pharmaceuticals, brand manufacturer Pfizer stated: "Teva's petition [to prevent the launch of an authorized generic] is a flagrant effort to stifle price competition – to Teva's benefit and the public's detriment." Comment of Pfizer at 6-7, Docket No. 2004P-0261 (June 23, 2004), https://web.archive.org/web/20050601041653/http://www.fda.gov/ohrms/dockets/dailys/04/June04/062904/04p-0261-cr00001-01-vol2.pdf; Comment of Johnson & Johnson at 1, Docket No. 2004P-0075 (May 11, 2004), https://web.archive.org/web/20041227172543/http://www.fda.gov/ohrms/dockets/dailys/04/June04/060404/04p-0075-c00002-vol1.pdf.

[34] Ernst R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare*, 26 Health Affairs 790, 796 (2007).

61.     The FTC similarly found that AGs capture a significant portion of sales, reducing the first-filer generic's revenues by about 50% on average.[35]

62.     The first-filer generic makes much less money when it faces competition from an AG because: (i) the AG takes a large share of unit sales away from the first-filer; and (ii) the presence of the AG causes prices, particularly generic prices, to decrease.

### C.     Manipulation of the Regulatory Structure to Impair Competition

63.     When a brand manufacturer sells a pharmaceutical product with no generic competition in the marketplace, the brand manufacturer receives all the profits from all unit sales. In this circumstance, a brand manufacturer can typically sell its drug for far more than the marginal cost of production, often generating profit margins of 80% or more while achieving hundreds of millions, or billions, of dollars in sales. The ability to achieve those kinds of profit margins is what economists refer to as market power.

64.     When a generic equivalent enters the market, however, it quickly captures 80% or more of the unit sales from the brand drug. Consequently, the brand manufacturer loses most of the unit sales. The generic manufacturer sells almost all of the units but at drastically reduced prices—delivering enormous savings to drug purchasers. When multiple generics compete in the market, that competition drives prices down to a level near the marginal cost of production. This competition ends the brand manufacturer's market power and delivers enormous savings to drug purchasers. Through competition, what were formerly excess profits are converted into savings for purchasers.

65.     While brand manufacturers and first-filer generic manufacturers are typically marketplace competitors, they share a collective interest in preventing robust competition from other generic manufacturers—competition that severely depresses prices—from emerging. If the brand and first-filer generic work together to prevent or delay such competition, they can maintain the profit margins on all unit sales at 70% and split the resulting excess profits among themselves. In other words, by stifling competition, the brand manufacturer and first-filer generic manufacturer can maintain high prices, protect

---

[35] FTC 2011 AG Study at 139.

their profits, and split between themselves the enormous savings that increased generic competition would have delivered to drug purchasers.

66.    **Figure 1** compares the impact on a brand manufacturer's profits between two situations: one in which it settles a patent lawsuit on the merits (i.e., with only an agreed entry date and without a pay-off to the generic company) and another in which it settles the lawsuit with a large, unjustified payment to the generic manufacturer. In the former situation, the agreed entry date for the generic is earlier, and the brand manufacturer's profits are thus greatly reduced. In the latter situation, the agreed entry date is later, and the brand manufacturer's profits increase significantly.

**Figure 1. Impact of Reverse Payment Settlement on Brand Profits**



67.    For such an anticompetitive pact to be effective, brand and generic manufacturers require a means to divide the ill-gotten gains—the increased profit to the detriment of drug purchasers—that delayed competition makes possible. After all, the generic manufacturer will not refrain from competing if it does not share in the profit gains through some means. The means sometimes takes the form of payoffs from the brand manufacturer, deals that are often referred to as "pay-for-delay," "exclusion payment," or "reverse payment" agreements.

68.     The brand manufacturer may choose to—unlawfully—pay off generic manufacturers. Pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. They extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

69.     The profit sharing through delayed entry can also take the form of market or profit allocations. Both the brand company and the generic company may decide, for example, that each will give up the ability to compete in some way (the brand by not launching an AG; the generic by delaying its initial entry) such that both can reap supracompetitive profits for certain periods of time. Such allocations may not involve a cash payment at all—both the brand and generic forego some ability to compete, but do so in service of their goals to reach an agreement to increase their respective profits.

70.     Agreements such as these—whether "pay-for-delay" or market allocations—are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. They extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs and reduce competition among generics, forcing purchasers to pay more than they should.

## D.     No-AG Agreements Provide a Means for Brand and Generic Manufacturers to Share the Gains from Conspiring

71.     In the 1990s, pay-offs from brand manufacturers often took the form of cash payments to would-be generic competitors. Since the 2000s—as a result of regulatory scrutiny, congressional investigations, and class action lawsuits—brand and generic manufacturers have entered into increasingly elaborate agreements in an attempt to conceal anticompetitive agreements.

72.     One example is a "no-authorized generic" or "no-AG" agreement. With a no-AG agreement, the brand manufacturer agrees not to market an AG version of the brand drug for a specified period after the first generic enters the market in exchange for the first generic agreeing to a delayed entry date.

73.     No-AG agreements between a brand manufacturer and would-be generic competitors are sometimes explicit. At other times, such agreements may be structured in a way that ostensibly reserves some right for the brand manufacturer to sell a generic version of its branded product, but that still

functions as a no-AG agreement, resulting in the same impact on competition as an explicit no-AG agreement. The FTC recognizes the existence and impact of such functional no-AG agreements. In a study by the FTC of the settlement agreements, the FTC explained that:

> The most common form of possible compensation—appearing in 9 final settlements—is a commitment from the brand manufacturer not to use a third party to distribute an authorized generic for a period of time, such as during first-filer exclusivity. This type of commitment could have the same effect as an explicit no-AG commitment, for example, if the brand company does not market generics in the United States.[36]

74. That same FTC report explained that an agreement that includes a "declining royalty structure, in which the generic's obligation to pay royalties is reduced or eliminated if a brand launches an authorized generic product" can have "the same effect as an explicit no-AG commitment."[37]

75. Absent a no-AG promise, it often makes economic sense for the brand manufacturer to begin marketing an AG through a third party as soon as (or sometimes weeks or months before) the first generic enters the marketplace. The AG entry enables the brand company to adopt a price strategy (competing with a low-priced generic), which diverts sales from what would otherwise be sold by the first generic. Competition from an AG typically cuts the first generic's revenues in half. With two generics in the market (the generic and the AG), the two products compete on price. This lowers prices, delivering savings to payers of prescription drugs.

76. To prevent an AG from causing this substantial loss of revenues and profits, a generic manufacturer may be willing to delay launching its generic version of a drug in return for the brand manufacturer's agreement to forgo competing by launching or licensing an AG during the exclusivity period. The additional monopoly profits that the brand manufacturer gains from the delayed onset of generic competition more than make up for the profits it forgoes by temporarily not competing with its

---

[36] *Overview of Agreements Filed in FY 2016: A Report by the Bureau of Competition* at 2, FTC (2017), https://www.ftc.gov/system/files/documents/reports/agreements-filled-federal-trade-commission-under-medicare-prescription-drug-improvement/mma_report_fy2016.pdf. *See also* Brad Albert, Armine Black, and Jamie Towey, Bureau of Competition, *MMA Reports: No tricks or treats – just facts*, FTC (Oct. 27, 2020), https://www.ftc.gov/enforcement/competition-matters/2020/10/mma-reports-no-tricks-or-treats-just-facts.

[37] *Overview of Agreements Filed in FY 2016: A Report by the Bureau of Competition* at 2.

AG. The brand manufacturer benefits from the delayed onset of generic competition, while the generic gains from the absence of competition.

77.     Drug purchasers, who bear the brunt of the higher prices, lose. No-AG agreements delay generic entry into the marketplace, extending the time when the more expensive brand is the only product on the market.

78.     For the generic manufacturer, the difference between selling the only generic and competing against an AG for a period of time can amount to tens or even hundreds of millions of dollars, depending on the size of the brand's sales. A no-AG agreement thus has the same economic effect as a pay-off made in cash. As explained by the then-Chairman of the FTC:

> Because the impact of an authorized generic on [a generic manufacturers] revenue is so sizable, the ability to promise not to launch an AG is a huge bargaining chip the brand company can use in settlement negotiations with a . . . generic. It used to be that a brand might say to a generic, "if you go away for several years, I'll give you $200 million." Now, the brand might say to the generic, "if I launch an AG, you will be penalized $200 million, so why don't you go away for a few years and I won't launch an AG."[38]

79.     Courts agree that no-AG agreements are a form of payment actionable under *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), and are anticompetitive.[39]

80.     For a generic manufacturer in a situation involving a brand drug with more than hundreds of millions or billions of dollars in annual sales, the difference between selling a generic without having to compete against another generic, whether AG or otherwise, amounts to tens, and in some instances, hundreds of millions of dollars. These economic realities are well known in the pharmaceutical industry. No-AG agreements thus allow competitors to benefit from an agreement not to compete, denying purchasers the consumer surplus that should flow to them from increased competition.

---

[38] *Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics* at 1, FTC (June 24, 2009), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authgenstatementleibowitz.pdf.

[39] *See In re Loestrin 24 Fe Antitrust Litig*., 814 F.3d 538, 549-50 (1st Cir. 2016); *In re Opana ER Antitrust Litig*., 162 F. Supp. 3d. 704, 716-18 (N.D. Ill. 2016); *In re Aggrenox Antitrust Litig*., 94 F. Supp. 3d 224, 242 (D. Conn. 2015); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig*., 2014 WL 4988410, at *20 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. AstraZeneca A*B, 52 F. Supp. 3d 705, 709-10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig*., 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig*., 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

81.    **Figure 2** depicts what happens when a settlement agreement includes a no-AG promise. The red area shows the brand manufacturer's additional monopoly profits earned during the period of delay. The purple area shows the amount of monopoly profit the brand manufacturer gives up (i.e., shares with the generic) by not selling its own AG.

**Figure 2. Impact of No-AG Clause on Brand Profits**



82.    **Figure 3** depicts the generic manufacturer's principal considerations in deciding whether to accept a settlement that includes a no-AG agreement. Without a settlement, the generic could enter the market earlier—either when the 30-month stay expires ("at risk") or when it wins the litigation. The generic manufacturer's profits (gross margins) would be high during the any exclusivity period and then fall rapidly as additional generics enter. This profit flow is somewhat uncertain because (i) if the generic launches at risk, it could (theoretically) later be found to infringe a valid patent, and (ii) it is expected that the brand manufacturer will launch an authorized generic and capture approximately 50% of the generic's sales. With a no-AG promise, the profit flow occurs later but is more certain and is larger—roughly twice the size—because the generic manufacturer does not lose half of the market to the brand manufacturer's authorized generic and can charge a higher price.

1

**Figure 3. Impact of No-AG Promise on Generic's Profits**

2

3



4

5

6

7

8

9

10

11

12

13    83.    Pay-offs by means of no-AG clauses usually exceed the value that the generic

14    manufacturer could have obtained even if it had won the patent infringement litigation. By settling the

15    patent case in exchange for a no-AG payoff, the generic manufacturer converts any ANDA exclusivity

16    period into total generic exclusivity that it was not otherwise entitled to, thus doubling its unit sales and

17    making those sales at a higher price.

18    **VI.    FACTUAL ALLEGATIONS**

19         **A.    Development and Approval of Dexilant**

20    84.    Defendant Takeda Pharmaceuticals U.S.A., Inc. is the registered holder of approved New

21    Drug Application No. 22-287 for the manufacture and sale of the drug Dexilant (dexlansoprazole).

22    85.    Takeda markets dexlansoprazole under the trade name Dexilant. Dexilant is a proton

23    pump inhibitor ("PPI") used to treat treatment of all grades of erosive esophagitis, maintaining healing

24    of esophagitis, and treating heartburn associated with GERD.

25    86.    Dexlansoprazole reduces the acid in one's stomach by blocking the final step of stomach

26    acid production. It is released in two stages, based on different acidity levels in the human intestine.

27    87.    The FDA approved 30 mg and 60 mg dosage forms of Dexilant on January 30, 2009.

28

88.     Originally, Takeda marketed dexlansoprazole under the name Kapidex. In or around March 2010, to avoid potential confusion with two other medications, Takeda began marketing dexlansoprazole under the new name Dexilant.

89.     Dexilant generated significant revenue and profits for Takeda. Dexilant sales grew from around $200 million annually in 2010 to over a billion dollars annually beginning in 2015 and nearly every year thereafter until generic dexlansoprazole came to the market in 2022.

**B.      Takeda's Patents and Orange Book Listings, and Generic Manufacturers' ANDA Filings**

90.     Due to the large market for Dexilant, it was not long before other pharmaceutical manufacturers began undertaking efforts to launch their own generic versions of the drug.

91.     Potential generic competitors' efforts to enter the market to compete with Dexilant were impacted by Takeda's Dexilant-related patents.

92.     Takeda owns and over time has listed numerous patents in the Orange Book, claiming that those patents covered Dexilant.

93.     Takeda also owns and has asserted claims for infringement of patents that were not listed in the Orange Book that it alleges were infringed by generic Dexilant ANDA products.

94.     Takeda's asserted patents relating to Dexilant (including those listed in the Orange Book for NDA 22-287), along with their titles and expiration dates,[40] are as follows:

| U.S. PATENT NO. | TITLE | ISSUE DATE | EXPIRATION DATE | LISTED IN ORANGE BOOK |
|---|---|---|---|---|
| 7,737,282 (" '282 patent") | Benzimidazole Compound Crystal | 2/26/2009 | 6/15/2020 | No |

---

[40] Some of Takeda's patents received a patent extension for delays in regulatory approval and a pediatric exclusivity extension, which could add six months to their FDA term. For example, the '276 Patent, originally set to expire on June 15, 2020, received a patent term extension of 959 days, and a six-month pediatric exclusivity extension, resetting the patent expiration to July 30, 2023.

CLASS ACTION COMPLAINT
CASE NO.:

| U.S. Patent No. | Title | Issue Date | Expiration Date | Listed in Orange Book |
|---|---|---|---|---|
| 6,462,058 (" '058 patent") | A novel crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]sulfinyl]-1Hbenzimidazoleor a salt thereof of the present invention is useful for an excellent antiulcer agent | 10/8/2002 | 6/15/2020 | Yes |
| 6,939,971 (" '971 patent") | Benzimidazole Compound Crystal | 9/06/2005 | 6/15/2020 | Yes |
| 7,285,668 (" '688 patent") | Process for Crystallization of (R)- or (S)-Lansoprazole | 10/23/2007 | 6/15/2020 | Yes |
| 9,145389 (" '389 patent") | Benzimidazole Compound Crystal | 9/29/2015 | 6/15/2020 | Yes |
| 6,664,276 (" '276 patent") | Benzimidazole Compound Crystal | 12/16/2003 | 1/30/2023 | Yes |
| 8,722,084 (" '084 patent") | Controlled Release Preparation | 5/13/2014 | 10/15/2023 | Yes |
| 8,784,885 (" '885 patent") | Controlled Release Preparation | 7/22/2014 | 10/15/2023 | Yes |
| 8,461,187 (" '187 patent") | Multi PPI Dosage Form | 6/11/2013 | 1/17/2026 | Yes |

| U.S. PATENT NO. | TITLE | ISSUE DATE | EXPIRATION DATE | LISTED IN ORANGE BOOK |
|---|---|---|---|---|
| 9,238,029 (" '029 patent") | Multi PPI Dosage Form | 1/19/2016 | 1/17/2026 | Yes |
| 9,011,926 (" '926 patent") | Method for Producing Granules | 4/21/2015 | 2/24/2026 | Yes |
| 7,790,755 (" '755 patent") | Controlled Release Preparation | 9/7/2010 | 8/2/2026 | Yes |
| 8,105,626 (" '626 patent") | Granules Containing Acid-Unstable Chemical In Large Amount | 1/31/2012 | 9/27/2026[41] | Yes |
| 8,871,273 (" '273 patent") | Method for Producing Granules | 10/28/2014 | 1/11/2028 | Yes |
| 8,173,158 (" '158 patent") | Methods of Treating Gastrointestinal Disorders Independent of the Intake of Food | 5/8/2012 | 3/17/2030[42] | Yes |
| 9,233,103 (" '103 patent") | Methods for Treating Heartburn, Gastric Bleeding or Hemorrhage in Patients Receiving Clopidogrel Therapy | 1/12/2016 | 3/5/2032 | Yes |

95.     Because Takeda had listed patents in the Orange Book for Dexilant, potential generic competitors were required to certify against any patents that were listed at the time when they filed ANDAs for their generic Dexilant products.

---

[41] With an extension for pediatric exclusivity until March 27, 2027.

[42] With an extension for pediatric exclusivity until September 17, 2027.

CLASS ACTION COMPLAINT
CASE NO.:

96.    Handa Pharmaceuticals, LLC ("Handa") was the first company to file an ANDA and certify against Takeda's then-listed patents for the 60 mg generic dexlansoprazole product. Handa filed its ANDA on August 25, 2010, with a Paragraph IV certification to Takeda's then-listed patents. Handa subsequently transferred its ANDA to Par Pharmaceutical Companies Inc. ("Par") in April 2012.

97.    Impax Laboratories, Inc. ("Impax") was the first pharmaceutical company to file an ANDA and certify against Takeda's then-listed patents for the 30 mg generic dexlansoprazole product. Impax filed its ANDA on November 30, 2010, with a Paragraph IV certification to Takeda's then-listed patents.

98.    Generic manufacturer Anchen Pharmaceuticals, Inc. ("Anchen") filed ANDAs for 30 mg and 60 mg generic dexlansoprazole, which it transferred to Defendant TWi in May 2011. Like Par and Impax, TWi filed paragraph IV certifications to one or more of the Takeda patents then listed in the Orange Book.

99.    Other generic manufacturers similarly filed ANDAs for 30 and/or 60 mg dexlansoprazole after Par, Impax, and TWi that included paragraph IV certifications.

**C.    Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial Rulings**

**1.    Litigation Concerning the '282, '755, '058, '275, '971, and '668 Patents**

100.    In response to the ANDA filings for generic dexlansoprazole and their accompanying paragraph IV certifications, Takeda filed patent infringement lawsuits against TWi, Par, Impax, and others.

101.    The first (and only) trial of Takeda's various Dexilant patent infringement lawsuits took place in June 2013 in the Northern District of California before Magistrate Judge Joseph C. Spero. The trial consolidated Takeda's then-pending actions and claims against TWi, Par, and Impax.

102.    The issues in the trial were whether each ANDA infringed various claims of the '282, '755, '058, '276, '971, and '668 patents, the adequacy of the disclosures in the patents, and whether the patents were anticipated or obvious in view of the prior art. The court's claim construction ruling narrowed some infringement claims and subsequently, on summary judgment, the court resolved

additional infringement claims for each ANDA holder and certain validity questions on the asserted patents.

103.   Takeda conceded that TWi's ANDA did not infringe four patents: the '058, '276, '971, and '668 patents, and the court entered final judgment of non-infringement for TWi with respect to those patents. At summary judgment, the court found that TWi's ANDA did not infringe the '755 patent; however, the court granted Takeda's summary judgment motion that TWi's ANDA did infringe claims 1 and 2 of the '282 patent. The court also denied TWi's motion challenging the validity of the '282 patent based on grounds of anticipation.

104.   The court found at summary judgment that Par's ANDA did not infringe the '755 patent; however, the court denied Par's summary judgment motion asserting non-infringement of the '276 patent, finding triable issues of fact remained as to infringement of that patent. The court also denied Par's motion challenging the validity of the '282 patent based on grounds of anticipation and granted summary judgment to Takeda that the Par ANDA infringed the '282 patent.

105.   As to Impax, the court found at summary judgment that Impax's ANDA did not infringe the '755 patent; however, the court granted Takeda's summary judgment motion, finding that that the '058, '276, and '971 patents were infringed by Impax's ANDA. The court rejected Impax's claims that the '971 patent lacked adequate written description to support the asserted claims and denied Impax's cross motion of non-infringement of the '971 patent.

106.   Following summary judgment, the following issues remained for trial: (a) infringement of the '276 patent against Par (Handa); (b) validity of the '276, '058, and '971 patents as obvious in view of the prior art; (c) validity of the '282 patent in view of anticipation, obviousness, or lack of sufficient written description; (d) questions of standing of certain Takeda entities to assert infringement of the '282 patent; and (e) whether Takeda could establish jurisdiction under the Declaratory Judgment Act "(DJA") against TWi for infringement of the '282 patent under §271(a) of the Patent Act.

107.   Following a weeklong trial, on October 17, 2013, the district court issued its Findings of Fact and Conclusions of Law. The court found that: (a) Par's ANDA product infringed the '276 patent; (b) the '276, '058, and '971 patents were not obvious in view of the prior art; (c) the '282 patent was

neither anticipated nor obvious in view of the prior art, and did not lack sufficient written description; (d) the Takeda entities had standing to assert the '282 patent against TWi; and (e) Takeda could not assert the DJA against TWi for infringement of the '282 patent under §271(a).

108.    During the trial, TWi had presented evidence that the '282 patent was invalid based on anticipation in the prior art or obviousness:

> Takeda concedes that the '282 patent's asserted claims are anticipated by the prior art Larsson and Von Unge references, unless the claim term "amorphous" is construed as limited to *solid* compounds. There is no "clear indication in the intrinsic record" justifying limiting the term to just solids. *E.g., Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Takeda does not contest its own expert's testimony that the "plain and ordinary meaning" of amorphous includes nonsolids. (A1985; A1989.) Rather, Takeda admits that the extrinsic evidence shows that the term "amorphous" can be used to refer to liquids, but argues that it "typically" refers to solids. (Red Bf. 18-19.) That is not enough to limit the claims to solids, because claims are not limited only to what is "typically" used. *E.g., Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1374 (Fed. Cir. 2006).

> Even if limited to only solids, the asserted claims of the '282 patent are invalid in view of the prior art Barberich reference, either alone or in combination with the other prior art. Only Takeda's argument in the District Court that Barberich was not enabled stood in the way of a holding of invalidity. But on appeal, in an attempt to deflect from its patent's written description problems, Takeda has conceded that "it is undisputed that a person of ordinary skill in the art could create a salt of an amorphous compound of dexlansoprazole (which must be solid under the court's claim construction) based on the disclosure in Barberich." (red Bf. 27.) That disposes of Takeda's ability to argue nonenablement of Barberich. Furthermore, the prior art taught three ways to make the solid amorphous solid dexlansoprazole disclosed by Barberich. Takeda myopically focuses its comments on the alleged difficulty in literally following the procedure in the Larsson reference. However, any procedure available in the prior art is sufficient. *E.g., Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003). Moreover, the law embraces adaptations within the skill in the art. *E.g., In re Lamberti*, 545 F.2d 747, 750 n.2 (CCPA 1976).[43]

109.    The court's final judgment prevented TWi from obtaining the final approval of its ANDA needed to launch its generic until the expiration of the '282 patent on June 15, 2020. Impax and Par, who were also delayed by the '282 patent, were further prevented from obtaining approval—for Impax, until

---

[43] TWi Pharm., Inc.'s Response and Reply Brief, *Takeda Pharm. Co. Ltd., et al. v. TWi Pharma., Inc.*, Appeal Nos. 14-1074, 14-1129 (Fed. Cir. Nov. 24, 2014).

CLASS ACTION COMPLAINT
CASE NO.:

after the expiration of the '058, '276, and '971 patents; and for Par, after the expiration of the '276 patent. These delays were subject to further patent term extensions for those patents under review at the PTO.

110.    Unless a court were to overturn these rulings on appeal, TWi would need to wait until after the expiration of the '282 patent on June 15, 2020, to secure approval to launch its generic, and Par and Impax would need to wait until at least January 30, 2023, to secure approval to launch their generics. TWi effectively leapfrogged Par and Impax in its ability to come to market, as their losses at trial caused Par and Impax to forfeit their first-filer status and related exclusivity.

111.    Takeda recognized TWi's position of advantage compared to other generics due to the trial rulings, stating in a post-trial press statement: "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020."[44]

### 2.    Litigation Concerning the '158 and '187 Patents

112.    On April 26, 2013, Par filed a complaint against Takeda seeking a declaratory judgment of invalidity and/or non-infringement of the '626 and '158 patents. No. 5:13-cv-01927, ECF No. 1. On May 29, 2013, Takeda answered Par's complaint and served counterclaims alleging Par infringed or would infringe the '158 patent (but not the '626 patent). *Id.*, ECF No. 20. The same day, Takeda filed patent infringement cases against Impax (No. 5:13-cv-02416), Sandoz (No. 5:13-cv-02418), and TWi (No. 5:13-cv-02420) regarding the '158 patent. These cases were related in front of Judge Lucy H. Koh. No. 5:13-cv-01927, ECF No. 29.

113.    As discussed below, Takeda settled its patent infringement claims against Par and Impax in 2014 before any dispositive decisions on the patent infringement claims.

114.    On July 9, 2013, Takeda amended its complaint against TWi to add a claim for infringement of the '187 patent and later filed a second amended complaint concerning both patents. No. 5:13-cv-02420, ECF No. 17. Takeda filed a case narrowing statement on February 2, 2015, indicating that Takeda was asserting seven claims: claim 1 of the '158 patent and claims 1, 2, 5, 6, 7, and 16 of the

---

[44] Alex Lawson, *Takeda Triumphs In Suits To Block Generic Dexilant*, Law360 (Nov. 4, 2013), https://www.law360.com/articles/485773/takeda-triumphs-in-suits-to-block-generic-dexilant.

CLASS ACTION COMPLAINT
CASE NO.:

'187 patent. ECF No. 138. Takeda had listed the '158 and '187 patents in the Orange Book after TWi (through Anchen) made its paragraph IV certification on Dexilant.

115.     On February 19, 2015, TWi moved for summary judgment on the '158 and '187 patents, arguing that the asserted claims of the '187 patent are anticipated by Takeda Japan's offer to sell TAK-390MR (the development code name for Dexilant) to TAP (a Takeda joint venture). TWi also argued that the asserted claims of both the '187 and '158 patents were anticipated by prior art. Alternatively, TWi argued that the '158 patent was not infringed. Takeda moved for summary judgment only on TWi's affirmative defenses of inequitable conduct.

116.     The court granted in part and denied in part the parties' summary judgment motions. Specifically, the court granted TWi's motion as to non-infringement under the doctrine of equivalents, otherwise denying TWi's motion. The court granted Takeda's motion as to the '158 patent and denied it as to the '187 patent.

117.     TWi supported its argument that the '187 and '158 patents are invalid with ample evidence.

118.     As to the '187 patent, TWi presented evidence that Takeda Japan offered to sell TAK-390MR to TAP. If TWi could prove by clear and convincing evidence that (1) "the product [was] the subject of a commercial offer for sale"; and (2) "the invention [was] ready for patenting," the '187 patent would be invalid. The Offer Letter contained a "Supply Term" stating that "TAP shall purchase TAK390MR preparations from [Takeda Japan] until the last TAK390MR patent is expired." TAP's legal counsel went further, stating that "[o]f course, we are certainly willing to state in the License Agreement that TAP will buy all of its requirements from Takeda if the parties later are able to arrive at a mutually acceptable price." And the Offer Letter contained other terms that, according to the Court, were "indicative of an offer for sale," including "an initial payment of 3 billion Yen upon signing the license agreement, a royalty payment of 6% of net sales, and a transfer price per 60 mg capsule." TAP's former CEO admitted that this document stated the price at which TAP "would buy the capsule[.]" The Offer Letter also indicated that the transfer price would be the same for TAK-390MR as for Prevacid, which Takeda Japan was already selling to TAP. The day after Takeda Japan made the Offer, Takeda Japan and

1    TAP met in Chicago to discuss the offer, and both inventors of the '187 patent were present. At that

2    meeting Takeda informed TAP that Takeda had filed "the patents covering TAK-390MR technologies."

3    Given this evidence, TWi was well positioned to succeed at trial to invalidate the '187 patent based on

4    an offer of sale.

5        119.    TWi also presented ample evidence that the '187 and '158 patents were anticipated by

6    prior art, specifically the Akiyama II patent—the '755 patent. Although Takeda disputed that Akiyama

7    II is prior art to the '187 patent, it admitted that Akiyama II would anticipate the '187 patent if it is prior

8    art. The '187 patent has an earliest filing date of June 16, 2004. Akiyama II was issued on September 7,

9    2010, but the international application from which Akiyama II is derived was filed in English on October

10   15, 2003, and lists the United States as one of the countries in which the inventors sought a patent. The

11   parties thus agreed that the earliest priority date of Akiyama II was October 15, 2003, which is before

12   the application for the '187 patent was filed. The parties also agreed that Example 57 of Akiyama II

13   discloses TAK390-MR (i.e., Dexilant). TWi asserted, and Takeda's expert did not dispute, that Example

14   57 meets every limitation of the asserted claims of the '187 patent. Thus, the only anticipation issue

15   regarding the '187 patent was whether the inventors conceived of the '187 patent prior to October 15,

16   2003—at least eight months before they filed the application for the '187 patent—and more specifically,

17   whether a single limitation in claim 1 of the '187 patent was anticipated, namely the limitation that the

18   second dose of the drug contain at least 10% more of the drug than the first dose.

19       120.    TWi relied on the testimony of one of the inventors of the '187 patent, who was also

20   Takeda's Fed. R. Civ. P. 30(b)(6) witness regarding the conception and reduction to practice of the

21   asserted claims. The inventor testified that results from a study available on December 22, 2003, led to

22   the conception of the "at least 10%" limitation. In a declaration submitted in connection with summary

23   judgment, a different inventor stated that the inventors had conceived of increasing the dose by at least

24   100% by March 2003, before Akiyama II. Takeda would not have prevailed using this argument at trial.

25   Under controlling Federal Circuit precedent cited by the court in connection with summary judgment, a

26   "sufficiently generalized" conception of a species within the genus of the claim limitation does not

27   constitute conception of the entire genus. An increase of at least 100% is so far afield from an increase

28

CLASS ACTION COMPLAINT
CASE NO.:

1    of 10% that, under the standards applicable at trial, TWi would have prevailed in showing that the

2    inventors had not conceived of this key claim limitation until after the date of Akiyama II, and thus the

3    '187 patent was anticipated.

4        121.    The court also denied Takeda's motion for summary judgment on TWi's defense of

5    inequitable conduct regarding the '187 patent, leaving this defense available to TWi at trial. The inventors

6    of the '187 patent affirmed in a declaration under oath to the PTO that they were the first to invent the

7    subject matter of the '187 patent but did not disclose Akiyama II. The court held Akiyama II was material

8    only if it was prior art—which, as explained above, it likely would be found to be at trial—and that "a

9    reasonable fact finder could conclude that the '187 Patent inventors knew that they were not the first to

10   invent, but submitted a declaration to the Patent Office stating otherwise. The knowing submission of a

11   false declaration 'raises a strong inference of intent to deceive.'"

12       122.    Regarding the '158 patent, Takeda did not dispute that Akiyama II is prior art to the '158

13   patent but disputed that Akiyama II anticipates claim 1 of the '158 patent. The sole issue with regard to

14   anticipation was whether Example 57 of Akiyama II anticipates the "regardless of whether the patient is

15   under fasted or fed conditions" limitation in claim 1 of the '158 patent. Akiyama II did not specify

16   whether the drug should be administered with or without food, suggesting that the drug could be

17   administered under fasted or fed conditions. Takeda argued that a person of skill in the art reading

18   Akiyama II would expect to administer the drug under fed conditions, but Takeda mainly relied on

19   evidence from well after Akiyama II. As a result, TWi would have prevailed on this issue at trial as well.

20       123.    Additionally, the court also held there was a genuine dispute of fact as to literal

21   infringement of claim 1 of the '158 patent, but that Takeda could not assert infringement under the

22   doctrine of equivalents as a matter of law. Therefore, if Takeda were to lose on literal infringement, it

23   could not succeed on its infringement claim. As to literal infringement, the court found that whether to

24   grant summary judgment to TWi was a "close call," suggesting that Takeda's arguments were weak and

25   would have lost at trial. Thus, Takeda would not have been able to show infringement of the '158 patent

26   at trial.

27

28

**D.    Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial**

124.    Following the trial rulings, Par, TWi, and Impax all appealed the adverse aspects of the district court's decision to the Court of Appeals for the Federal Circuit. Takeda also cross-appealed the district court's determination that none of the generics manufactured by Par, TWi, and Impax infringed the '755 patent.

125.    TWi presented a strong appeal challenging the validity of the '282 patent, which was the only patent the district court found TWi had infringed.

126.    TWi asserted that the district court had misinterpreted the claim term "amorphous compound" by restricting it to solids, arguing that, when properly construed, the claims were anticipated by prior art. TWi also contended that, even under the district court's interpretation, the claims of the '282 patent were invalid for lack of written description and/or because they were anticipated or would have been obvious in view of prior art.

127.    TWi's anticipation and obviousness arguments resonated with the appellate judges. At oral argument before the Federal Circuit Court of Appeals on March 6, 2015, one of the judges questioned whether the district court's failure to consider the evidence on these arguments was "clearly erroneous" and inconsistent with the evidence.

128.    Meanwhile, Takeda presented a relatively weak appeal challenging the district court's determination that none of the defendants infringed the '755 patent. The claim language was unambiguous, and Takeda itself had even initially advocated for the claim construction adopted and applied by the district court.

129.    Takeda settled with each of the parties before the Federal Circuit issued a decision on the pending appeals.

130.    Takeda settled with Par on or around July 18, 2014 and with Impax on or around October 16, 2014. On or around April 27, 2015, seven weeks after oral argument before the Federal Circuit and shortly after the summary judgment order on the '158 and '187 patents, Takeda settled with TWi.

131.    By the end of 2015, Takeda had settled its ongoing infringement actions against all generic manufacturers whom it had sued with respect to ANDAs for Dexilant.

CLASS ACTION COMPLAINT
CASE NO.:

E.    **Takeda's Settlement with TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation from Takeda**

132.    Takeda's agreement with TWi to resolve their ongoing patent disputes regarding Dexilant was a "reverse payment" and market allocation agreement in violation of the antitrust laws.

133.    At the time of settlement in 2015, the only serious obstacle to entry that TWi faced was the '282 patent, which was set to expire on June 15, 2020. Despite its strong appeal, TWi agreed to postpone the launch of its generic Dexilant product until January 2022, approximately 18 months beyond the expiration of the '282 patent.

134.    TWi agreed to this delay in exchange for large and unjustified payments from Takeda. First, Takeda paid TWi $9.5 million as part of the agreement. TWi expressly acknowledged this payment in its annual report: "On April 27, 2015, the Company and Takeda Pharmaceutical Company Limited and its American Subsidiaries (individually and collectively "Takeda") entered into a settlement agreement with regards to pending patent litigation. In accordance with the terms of the agreement, Takeda paid the Company US $9,500 thousand."

135.    This payment from Takeda to TWi far exceeded any reasonable estimate of Takeda's future litigation expenses, particularly in light of the fact that, by the time Takeda paid TWi, the core patent claims had already been tried before the district court and fully briefed and argued to the appellate court. Moreover, while Takeda had filed a separate case against TWi regarding two other patents, at the time of the settlement, the issues in that later-filed case had been considerably narrowed through an order resolving cross motions for summary judgment.

136.    On top of the $9.5 million payment, Takeda also paid TWi by effectively granting TWi a monopoly on sales of generic Dexilant—the economic equivalent of a no-AG agreement.

137.    Under the agreement, Takeda gave TWi the option of launching an AG version of Dexilant rather than launching its own ANDA product (assuming FDA approval).

138.    Given a choice between launching an AG and launching its own ANDA product, a generic manufacturer will almost always find it more profitable to launch the AG and forgo launching the ANDA product, particularly if entry by other ANDA filers is unlikely for some significant period of time. If the

CLASS ACTION COMPLAINT
CASE NO.:

generic chooses to launch its ANDA product, the brand company will normally find it profitable to launch an AG in order to capture some portion of the sales that would otherwise go to the ANDA filer, splitting those sales and lowering generic prices. The generic manufacturer will almost always earn higher profits if there is a generic monopoly rather than a duopoly, even if it is required by the terms of the agreement to share those monopoly profits with the branded company.

139.     Takeda has a long history of launching AG products through one or more third parties and likely would have done the same with generic Dexilant had it not given TWi the option to launch the Dexilant AG.

140.     By giving TWi the option to launch an AG for Takeda, it effectively gave TWi the option to be the exclusive seller of generic Dexilant for a period of time. This promise was extremely valuable to TWi and induced TWi to accept a later entry date.

141.     TWi's press release shortly after the settlement summarizes its AG rights in part as follows:

> As part of the settlement, the parties also entered into a License and Supply Agreement allowing TWi and its affiliates to sell Dexilant in both dosage strengths as *the* Authorized Generic. (emphasis added)
>
> * * *
>
> Furthermore, the license and supply of the Authorized Generic from Takeda allows TWi to be ***the supplier of both strengths of a generic Dexilant in the U.S. market for a period, which provides significant sales and marketing advantage*** as well as furthering TWi's goal of bringing affordable healthcare to patients. (emphasis added)

142.     Consistent with the parties' agreement that TWi's AG rights would be exclusive, TWi describes them using the definite term "the" rather than indefinite terms such as "a" or "an," indicating that TWi understood that its AG would be the only AG on the market, as it was.

143.     TWi's references to an agreed period of time where it would have a "significant sales and marketing advantage" is also important. If Takeda retained the right to launch an AG in competition with the AG launched by TWi, there would be no need for the agreement to contain a set time period and no "significant sales and marketing advantage" during such time period.

144.    As promised to Takeda, TWi did not enter the market when the '282 patent expired on June 15, 2020. Instead, TWi waited until on or around January 3, 2022, to launch as an AG product pursuant to its license from Takeda.

145.    Takeda has never launched an AG Dexilant product to compete with TWi.

146.    In fact, as telegraphed by TWi in its 2015 press release just after the Agreement was inked, the AG product TWi sold in 2022 was the sole generic on the market for nearly a year, until November 22, 2022, at which point Par launched its own generic 60 mg dexlansoprazole delayed release capsule.

147.    Both Takeda and TWi benefitted from this unlawful agreement by avoiding fair and legal competition.

148.    Takeda benefitted because, rather than face competition from a generic Dexilant product, Takeda enjoyed a complete monopoly until January 2022. This unlawful extension of Takeda's monopoly allowed Takeda to continue profitably charging supracompetitive prices to purchasers much longer than would have otherwise been possible.

149.    Sales of the AG product TWi sold were more than $328 million in 2022 alone. If Takeda had launched an AG to compete with TWi's ANDA product, the AG would have captured a large share of those sales.

150.    By giving TWi the option to launch the AG rather than Takeda, Takeda effectively gave up at least a portion of the sales it would have made by launching an AG—a large transfer of value from Takeda to TWi.

151.    While TWi lost time on the market by waiting until January 2022 to launch the AG product, the lack of competition TWi enjoyed when it did enter as the sole generic, along with the $9.5 million payment from Takeda, more than compensated TWi for the delay.

**F.    Takeda Entered into Other Alleged Improper Agreements with Would-Be Competitors During this Same Time Period**

152.    Takeda had a practice of entering into anticompetitive agreements with competitors during this period of time.

153.    Approximately seven months prior to the Defendants' Agreement concerning Dexilant, Takeda entered into an agreement with generic competitor Par concerning a different Takeda drug called Amitiza ("Amitiza Agreement").

154.    Like Defendants' agreement here, the Amitiza Agreement is alleged to have been designed to prevent competition. Specifically, in exchange for Takeda's implicit commitment not to launch an AG for Amitiza, Par agreed to delay the launch of its generic Amitiza product. Several antitrust lawsuits have been filed concerning the Amitiza Agreement, and the court overseeing one of these cases denied Takeda's motion to dismiss, holding that the complaints plausibly stated a claim of an antitrust violation.

155.    A little over a year after the Amitiza Agreement, and within a year of Defendants' agreement as to Dexilant, Takeda entered into another agreement with a competitor, this time concerning Takeda's drug Colcrys ("Colcrys Agreement").

156.    According to the plaintiffs in yet another antitrust case against Takeda, Takeda agreed with generic competitors to allocate the market for Colcrys.

157.    In particular, under the Colcrys Agreement, generic competitors allegedly agreed to delay their market entry in exchange for defined periods of exclusivity at a later date. The plaintiffs in the Colcrys matter defeated a motion to dismiss and summary judgment, and Takeda ultimately settled at trial before a verdict was rendered.

### G.    Defendants' Agreement Would Remain Illegal Even if Takeda Retained the Right to Launch an AG or Received Royalties from TWi

158.    The terms of Defendants' Agreement have not been publicly disclosed.

159.    However, as explained above, Takeda and other pharmaceutical companies have previously entered into similar reverse payment agreements with competitors, including, *inter alia*, the Amitiza and Colcrys Agreements. In some previous agreements, to avoid scrutiny, the brand manufacturers have purportedly reserved the right to launch their own AGs and/or require royalties from the generic competitor when it eventually comes to market after the delay.

160.    If it were the case that the agreement between Takeda and TWi as to Dexilant here contained such terms, this would not change the illegality of Defendants' conduct.

161.    Opining on no-AG agreements, courts, including in the Amitiza lawsuit against Takeda, have held that such agreements need not be explicit—"implicit no-AG agreement[s]" are also unlawful.

162.    The generic company's payment of royalties does not change the analysis. Takeda argued in Amitiza that there can be no reverse payment if a generic is paying royalties. This argument was not only rejected, but the court also further held that Takeda's royalty structure with the generic in that case itself plausibly alleged a reverse payment.

163.    Thus, even if Takeda purported to reserve some ability to launch another AG in Defendants' written agreement, it is clear from the facts—including, inter alia, Takeda's failure to ever exercise any such right and TWi's statements suggesting it had exclusivity—that any such reservation would be pretextual.

164.    Further, even if TWi made some royalty payments to Takeda, those payments would not negate the reverse payment from Takeda to TWi.

165.    If anything, as Takeda has done in the past, the royalty amounts and/or structure would reinforce Takeda's commitment to refrain from launching an AG. For example, a declining royalty structure whereby Takeda would receive less if it launched an AG to compete with TWi would financially disincentivize Takeda from launching an AG and would in no way mitigate Defendants' Agreement's anticompetitive effects.

**H.    Without Defendants' Agreement, Two Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020, or Earlier**

166.    Absent Defendants' unlawful agreement, at least two generics would have been available by the time that the '282 patent expired on June 15, 2020.

167.    If Defendants had not entered into their unlawful agreement to delay generic Dexilant, TWi would have launched a generic product under its own ANDA on or about June 15, 2020. In turn, Takeda would have sold an AG to compete with TWi's product to capture some of the generic market.

168.    TWi's ANDA would have been approved on or before its entry date in 2020. TWi's ANDA was ultimately approved in September 2022, but approval would not have taken that long if not for Defendants' unlawful Agreement. FDA has a practice of focusing its limited resources on approval of products whose launches are imminent. TWi's agreement to delay its launch, coupled with its ability to come to market as an AG under Takeda's NDA, disincentivized TWi from aggressively seeking earlier approval and eliminated the need for FDA to act on TWi's application sooner.

169.    There were no first filer exclusivities standing in the way of TWi. The first filers—Par on the 60 mg product and Impax on the 30 mg product—forfeited their exclusivity due to their delays in getting their products tentatively approved and/or the findings of non- infringement at trial as to TWi on patents that were blocking the first filers.

170.    Additionally, Takeda's patents would not have delayed TWi's entry date. Takeda stipulated that several of its patents, specifically, the '058, '276, '971 and '668 patents, would not be infringed by TWi's ANDA product, and TWi prevailed at trial on all but the '282 patent, which expired in June 2020. While Takeda sued TWi on two other patents—the '187 and '158 patent—in a separate lawsuit, had the parties not settled, TWi would have prevailed in that litigation. Among other reasons, these patents were plainly invalid due to prior art, and TWi presented strong evidence that the '187 patent was invalid due to a prior offer of sale. Takeda's remaining patents purportedly covering Dexilant would have been easy for TWi to either design around or carve out or been subject to noninfringement or invalidity defenses similar to those TWi advanced against the '187 and '158 patents. Indeed, Takeda itself recognized, before its unlawful agreement with TWi, that generic entry was likely in June of 2020, stating: "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020."

171.    The court had also held that Takeda could not assert as a matter of law that claim 1 of the '158 patent was infringed under the doctrine of equivalents, meaning Takeda had to prove literal infringement—a tall bar given the court's finding that this issue was a "close call" at summary judgment. Takeda's remaining patents purportedly covering Dexilant would have been easy for TWi to either design around or carve out or been subject to noninfringement or invalidity defenses similar to those TWi advanced against the '187 and '158 patents.

## VII.    MARKET POWER AND DEFINITION

172.    The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Dexilant, to patients without a prescription. The patient's doctor chooses which product the patient will buy while the patient (and in most cases, his or her insurer) has the obligation to pay for the product.

173.    Brand manufacturers, including Takeda, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

174.    The relative unimportance of price to the prescriber reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up. This reduced-price elasticity, in turn, gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power.

175.    The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Dexilant.

176.    Before approximately January 3, 2022, Takeda had monopoly power in the market for Dexilant because it had the power to maintain the price of dexlansoprazole at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable. From approximately January 3, 2022, through November 22, 2022, Defendants allocated the market, providing TWi with monopoly power by making TWi the sole seller of generic Dexilant. Takeda and TWi combined had substantial market power in the market for Dexilant and its generic equivalents because they had the power to

exclude competition and/or raise or maintain the price of dexlansoprazole at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable.

177.    Before approximately January 3, 2022, a small but significant, non-transitory increase to the price of brand Dexilant would not have caused a significant loss of sales. From approximately January 3, 2022, through November 22, 2022, a small but significant, non-transitory increase in the price of generic Dexilant would not have caused a significant loss of sales.

178.    Brand Dexilant does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than the AG and AB-rated generic versions of Dexilant.

179.    For example, as of December 31, 2021, Dexilant was priced at a significant premium to non-Dexilant generic PPIs on the market. Even with premium pricing, Dexilant obtained broad insurance coverage and favorable access. As of December 2021, approximately 87% of commercially covered lives and 82% of Medicare covered lives had access to Dexilant. Furthermore, of those commercially covered lives, 48% had unrestricted access to the drug without prior authorization or step edits and 28% of patients had access at the lowest branded cost tier.

180.    Brand Dexilant is differentiated from all other drugs, including all other PPI products, other than the AG and AB-rated generic versions of Dexilant.

181.    Takeda (and, later, Takeda and TWi) needed to control only brand Dexilant (including the AG) and its AB-rated generic equivalents, and no other products, in order to maintain the price of dexlansoprazole profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions of Dexilant would render the Defendants unable to profitably maintain their prices for Dexilant and generic Dexilant without losing substantial sales.

182.    For several years, Takeda sold brand Dexilant at prices well in excess of marginal costs and in excess of the competitive price, and therefore, Takeda had extraordinarily high profit margins.

183.    From approximately January 3, 2022, through at least November 22, 2022 and likely beyond, TWi sold AG Dexilant at prices well in excess of marginal cost and in excess of the competitive price, and therefore, TWi had high profit margins.

184.    Takeda had and exercised the power to exclude generic competition to brand Dexilant.

185.     Takeda and TWi had and exercised the power to exclude generic competition to the TWi-marketed AG.

186.     At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Dexilant from the forces of price competition.

187.     There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of brand Dexilant and generic Dexilant, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence includes, *inter alia*, the following facts: (a) generic Dexilant would have entered the market at a much earlier date, at a substantial discount to brand Dexilant, but for the Defendants' anticompetitive conduct; (b) Takeda's gross margin on Dexilant (accounting for the costs of marketing and its share of Takeda's ongoing research/development costs) at all relevant times was very high; and (c) Takeda never lowered the price of Dexilant to the competitive level in response to the pricing of other brand or generic drugs.

188.     To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Dexilant, the AG, and AB-rated generic equivalents of Dexilant.

189.     The United States and its territories constitute the relevant geographic market.

190.     Takeda's market share in the relevant market was 100% until approximately January 3, 2022, when TWi launched its AG. From approximately January 3, 2022, until November 22, 2022, when generic seller Par launched a 60 mg generic Dexilant product, Defendants' share in the relevant market was 100%.

## VIII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

191.     During the Class Period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. All Defendants engaged in illegal activities, as charged herein, within the flow of, and substantially affecting, interstate commerce.

192.    During the relevant time period, Takeda and TWi manufactured, sold, and shipped brand and generic Dexilant throughout the United States, including across state lines, and in this District, in a continuous and uninterrupted flow through interstate commerce.

193.    By inflating, maintaining, or artificially stabilizing the price for brand and generic Dexilant, Defendants deprived purchasers of brand and generic Dexilant of the benefits of free and open competition, and thus had a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States, as well as intrastate commerce within each state.

## IX.    ANTITRUST IMPACT

194.    Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Dexilant, and later TWi's authorized generic Dexilant, from competition. These actions allowed Defendants to maintain a monopoly and to exclude competition in the market for brand and generic Dexilant, to the detriment of Plaintiff and all other members of the Class.

195.    Were it not for Defendants' illegal conduct, generic Dexilant would have been available in the United States beginning June 15, 2020. In addition, were it not for Defendants' illegal conduct, when generic Dexilant did become available earlier, there would have been full and fair competition, thereby reducing price to a competitive level.

196.    Plaintiff and Class members have incurred significant injury and damage as a result of the unlawful conduct of Defendants. During the period from June 15, 2020, to the present, Plaintiff purchased, paid for, and/or reimbursed for brand and generic Dexilant at supracompetitive levels and has done so in at least New Jersey and Pennsylvania. If the conduct challenged in this complaint had not occurred, Plaintiff would have paid for Dexilant under lawful competitive conditions, resulting in a substantial reduction in the amount it would have paid for Dexilant.

197.    Plaintiff and Class members have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Commonly used and well-accepted

economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to payors such as Plaintiff and Class members.

198.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, Plaintiff and Class members would have paid less for dexlansoprazole by (a) paying lower prices on their remaining brand purchases of Dexilant, (b) substituting purchases of less-expensive generic Dexilant for their purchases of more-expensive brand Dexilant, and/or (c) purchasing generic Dexilant at lower prices sooner.

199.    The supracompetitive prices Plaintiff and Class members paid and continue to pay are traceable to, and the direct, proximate, and foreseeable result of Defendants' anticompetitive conduct.

## X.    CLASS ACTION ALLEGATIONS

200.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of the following class (the "Class"):

> All persons or entities in the United States, its territories, and the District of Columbia who purchased or paid for brand or generic Dexilant for consumption by themselves, their members, employees, insureds, participants, or beneficiaries, and other than for resale, during the period from June 15, 2020, through and until the anticompetitive effects of the Defendants' unlawful conduct cease (the "Class Period").

201.    Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities, which do not include cities, towns, municipalities or counties with self-funded prescription drug plans.

202.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiff believes that there are thousands of members in the Class dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many Class members to bring individual claims and join them together. The Class is readily identifiable from information and records in the possession of Defendants, third-parties, and Class members.

203.    Plaintiff and the Class's claims are typical of the claims of the members of the Class as all members of the Class were damaged by the same wrongful conduct of the Defendants, i.e., they paid

artificially inflated prices for Dexilant and its generic equivalents and were deprived of earlier and more robust competition from more affordable generic versions of Dexilant because of the Defendants' wrongful conduct alleged herein.

204. Plaintiff will fairly and adequately protect the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class.

205. Plaintiff has retained counsel competent and experienced in the prosecution of class action antitrust litigation, with particular experience with class action litigation involving antitrust violations perpetrated by pharmaceutical manufacturers.

206. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive scheme;

b. whether there exist any legitimate procompetitive reasons for some or all of Defendants' conduct;

c. to the extent such justifications exist, whether there were less restrictive alternatives;

d. whether direct proof of Defendants' monopoly power is available and, if so, whether it is sufficient to prove Defendants' monopoly power without the need to define the relevant market;

e. whether Defendants' scheme, in whole or in part, has substantially affected interstate and/or intrastate commerce;

f. whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class;

g. whether Defendants conspired to delay and restrict generic competition for Dexilant;

h. whether Defendants' agreement constitutes an unlawful reverse payment agreement;

CLASS ACTION COMPLAINT
CASE NO.:

i.  whether, pursuant to Defendants' agreement, Takeda's effective promise not to compete against TWi's generic product constituted a payment and/or market allocation;

j.  whether Takeda's payments to TWi were large and unjustified;

k.  whether Defendants' agreement was necessary to yield some cognizable, non-pretextual procompetitive benefit;

l.  whether the Defendants' unlawful agreement harmed competition;

m.  whether the agreement between Takeda and TWi alternatively constituted an agreement to allocate markets that is a *per se* violation of the Sherman Act;

n.  whether, prior to January 2022, Takeda possessed the ability to control prices and/or exclude competition for Dexilant;

o.  whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Dexilant or in causing some amount of delay in the market entry of multiple competing AB-rated generic Dexilant products;

p.  determination of a reasonable estimate of the length of the generic-entry delay caused by the Defendants' unlawful conduct;

q.  the quantum of overcharges paid by the Class in the aggregate; and

r.  whether Plaintiff and the proposed Class are entitled to injunctive relief
in order to prevent Defendants' ongoing unlawful conduct.

207.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

208.    Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## XI.    CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT

209.    A cause of action accrued for Plaintiff and Class members each time the Defendants sold a brand or generic Dexilant product at a supracompetitive price made possible by their anticompetitive conduct.

210.    Each sale by Defendants of a product at a supracompetitive price constituted another overt act in furtherance of their anticompetitive scheme. On this basis, Plaintiff is entitled to recover damages on all sales that Defendants made to Plaintiff and Class members at supracompetitive prices within four years of the filing of this lawsuit.

211.    Due to Defendants' fraudulent concealment of their unlawful conduct, however, Plaintiff and members of the class are entitled to recover damages reaching back beyond four years of the filing of this complaint.

212.    Defendants' scheme was self-concealing, and Defendants also employed deceptive tactics and techniques to avoid detection of, and to affirmatively conceal, their contract, combination, conspiracy, and scheme. For example, TWi's press release regarding the settlement made no mention of the $9.5 million payment it received from Takeda and did not disclose any information regarding Takeda's agreement not to launch a competing AG. Defendants affirmatively chose not to publicly disclose critical and material details of their Agreement to conceal the agreement's numerous anticompetitive features.

213.    It was not until TWi actually launched its AG product in January 2022—and Takeda chose not to launch its AG—that the nature and terms of Defendants' Agreement were revealed and that Plaintiff and the Class's cause of action would have arisen as all predicate acts of the unlawful agreement were in effect.

214.    Plaintiff had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme and conspiracy through the exercise of due diligence more than four years before the filing of this Complaint.

215. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff and Class members' claims have been tolled.

**XII.    CLAIMS FOR RELIEF**

<u>**FIRST CLAIM FOR RELIEF**</u>

**Violation of 15 U.S.C. § 1**

216. Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

217. Defendants violated 15 U.S.C. § 1 by entering into an unlawful reverse payment agreement that restrained competition in the market for Dexilant and its generic equivalents.

218. Plaintiff and Class members have been injured in their business or property by the violation of 15 U.S.C. § 1. Their injury consists of having paid higher prices for their dexlansoprazole requirements than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes Defendants' conduct unlawful.

219. From the launch of brand Dexilant in 2009 through approximately January 2, 2022, Takeda possessed monopoly power in the relevant market—i.e., the market for sales of dexlansoprazole in the United States. But for Defendants' wrongful conduct, as alleged herein, Takeda would have lost its monopoly power in the relevant market beginning June 15, 2020.

220. From approximately January 3, 2022 to November 22, 2022, Takeda shared its monopoly power with TWi as a result of the anticompetitive reverse payment agreement between them. This agreement covers a sufficiently substantial percentage of the relevant market to harm competition.

221. From approximately January 3, 2022 through the present, by agreement, Takeda has not competed with its own AG Dexilant.

222. This conduct constitutes an agreement to allocate markets and is therefore a per se violation of 15 U.S.C. § 1.

223. In the alternative, there is and was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiff, Class

members, and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

224.    As a direct and proximate result of Takeda and TWi's anticompetitive conduct, Plaintiff and Class members were harmed and continue to be harmed in the form of overcharges.

225.    Plaintiff and the Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

### Violation of 15 U.S.C. § 2

### (Against Takeda)

226.    Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

227.    As described above, Takeda maintained its monopoly power in the relevant market thorugh approximately January 2, 2022, and from approximately January 3, 2022 to November 22, 2022, shared its monopoly power with TWi in an illegal monopoly.

228.    Takeda willfully and unlawfully engaged in continuing illegal conduct to monopolize the relevant market through approximately January 2, 2022 by engaging in an anticompetitive scheme to keep AB-rated generic equivalents of Dexilant from the market—not as a result of providing a superior product, business acumen, or historical accident.

229.    Plaintiff and Class members have been injured and continue to be injured in their business or property by Takeda's violation of 15 U.S.C. § 2. Such injury consists of having paid higher prices for their dexlansoprazole requirements than they would have paid in the absence of those violations. Such injury is of the type antitrust laws were designed to prevent, and it flows from that which makes Takeda's conduct unlawful.

230.    Plaintiff and members of the Class will continue to suffer injury, in the form of overcharges paid for brand and generic Dexilant, if Takeda's unlawful conduct is not enjoined.

231.    Plaintiff and the Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market

effects caused by Takeda's unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

### THIRD CLAIM FOR RELIEF

### Monopolization Under State Law

### (Against Takeda)

232.     Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

233.     As described above, Takeda possessed monopoly power nationwide and in each of the states and territories in the market for Dexilant and its generic equivalents until approximately January 2, 2022, and from approximately January 3, 2022 to November 22, 2022, shared its monopoly power with TWi.

234.     Takeda possessed substantial market power (i.e., monopoly power) in the relevant market. Takeda possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

235.     Through their anticompetitive scheme, as alleged above, Defendants willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured Plaintiff and the Class. Defendants' anticompetitive conduct was done with the specific intent to maintain its monopoly in the market for brand and generic Dexilant in the United States and its territories.

236.     Takeda knowingly and intentionally engaged in this anticompetitive scheme to monopolize the Dexilant market as described above. Takeda engaged in an exclusionary conduct scheme that involved a payment to TWi and commitment not to launch its own authorized generic Dexilant product to compete with TWi's AG in exchange for TWi's agreement to delay its market entry until 2022.

237.     The goal, purpose, and effect of Takeda's conduct was to maintain and extend its monopoly power with respect to Dexilant. Takeda's illegal scheme to delay the introduction of generic

Dexilant allowed it to continue charging supracompetitive prices for the drug without a substantial loss of sales.

238.    Takeda's illegal scheme allowed it to continue charging supracompetitive prices for Dexilant, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

239.    Plaintiff and members of the Class purchased substantial amounts of brand and generic Dexilant indirectly.

240.    As a result of Takeda's illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, more than they would have paid for their requirements of brand and generic Dexilant absent Takeda's illegal conduct. But for Takeda's illegal conduct, competitors would have begun selling AB-rated generic Dexilant during the relevant period, and prices for brand and generic Dexilant would have been lower, sooner.

241.    Had manufacturers of generic Dexilant entered the market and lawfully competed with Takeda earlier, Plaintiff and other members of the Class would have substituted lower-priced generic Dexilant for the higher-priced brand-name Dexilant or its AG for some or all of their requirements of Dexilant and its generic equivalents, and/or would have paid lower net prices on their remaining brand or generic Dexilant purchases.

242.    By engaging in the foregoing conduct, Defendants violated the following state antitrust laws:

  a.  Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*, with respect to purchases of brand and generic Dexilant in Arizona by members of the Class.

  b.  Cal. Bus. & Prof. Code § 16700, with respect to purchases of brand and generic Dexilant in California by members of the Class.

  c.  Conn. Gen. Stat. §§ 35-27, *et seq.*, with respect to purchases of brand and generic Dexilant in Connecticut by members of the Class.

  d.  D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of brand and generic Dexilant in the District of Columbia by members of the Class.

e.   Haw. Rev. Stat. §§ 480-1, *et seq*. with respect to purchases of brand and generic Dexilant in Hawaii by members of the Class.

f.   Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq*., with respect to purchases of brand and generic Dexilant in Illinois by members of the Class.

g.   Iowa Code §§ 553.5 *et seq.*, with respect to purchases of brand and generic Dexilant in Iowa by members of the Class.

h.   Kan. Stat. Ann. §§ 50-101 *et seq.*, with respect to purchases brand and generic Dexilant in Kansas by members of the Class.

i.   Me. Stat. tit. 10, §§ 1102, *et seq.*, with respect to purchases of brand and generic Dexilant in Maine by consumer members of the Class.

j.   Md. Code Ann., Com. Law §§ 11-204(a), *et seq*., with respect to purchases of brand and generic Dexilant in Maryland by members of the Class.

k.   Mich. Comp. Laws §§ 445.773, *et seq.*, with respect to purchases of brand and generic Dexilant in Michigan by members of the Class.

l.   Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of brand and generic Dexilant in Minnesota by members of the Class.

m.   Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of brand and generic Dexilant in Mississippi by members of the Class.

n.   Neb. Rev. Stat. §§ 59-802, *et seq.*, with respect to purchases of brand and generic Dexilant in Nebraska by members of the Class.

o.   Nev. Rev. Stat. §§ 598A.060, *et seq.*, with respect to purchases of brand and generic Dexilant in Nevada by members of the Class.

p.   N.H. Rev. Stat. Ann. §§ 356.11, *et seq.*, with respect to purchases of brand and generic Dexilant in New Hampshire by members of the Class.

q.   N.J. Stat. Ann. § 56:9 with respect to purchases of brand and generic Dexilant in New Jersey by members of the Class.

r.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of brand and generic Dexilant in New Mexico by members of the Class.

s.  N.Y. Gen. Bus. Law § 340, *et seq.*, with respect to purchases of brand and generic Dexilant in New York by members of the Class.

t.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of brand and generic Dexilant in North Carolina by members of the Class.

u.  N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases of brand and generic Dexilant in North Dakota by members of the Class.

v.  Or. Rev. Stat. §§ 646.730, *et seq.*, with respect to purchases of brand and generic Dexilant in Oregon by members of the Class.

w.  50 R.I. Gen. Laws §§ 6-36-5 *et seq.*, with respect to purchases of brand and generic Dexilant in Rhode Island by members of the Class.

x.  S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of brand and generic Dexilant in South Dakota by members of the Class.

y.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of brand and generic Dexilant in Tennessee by members of the Class.

z.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of brand and generic Dexilant in Utah by members of the Class.

aa. Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of brand and generic Dexilant in Vermont by consumer members of the Class.

bb. W. Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of brand and generic Dexilant in West Virginia by members of the Class.

cc. Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of brand and generic Dexilant in Wisconsin by members of the Class.

243.  Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Dexilant, and (2) paying higher prices for Dexilant and

1   its generic equivalents than they would have paid in the absence of Defendants' conduct. These injuries

2   are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants'

3   conduct unlawful.

4       244.    Plaintiff and the Class seek damages and multiple damages as permitted by law for their

5   injuries by Defendants' violations of the aforementioned statutes.

6                                   **FOURTH CLAIM FOR RELIEF**

7                       **Combination in Restraint of Trade Under State Law**

8       245.    Plaintiff incorporates by reference all of the allegations above as though fully set forth

9   herein.

10      246.    Defendants violated the state laws identified below by entering into an agreement in

11  unreasonable restraint of trade in executing and adhering to an agreement containing an unlawful reverse

12  payment by Takeda, consisting of a payment to TWi and a commitment by Takeda not to launch its own

13  authorized generic Dexilant product to compete with TWi's Dexilant AG, in exchange for TWi's

14  agreement to delay the launch of its generic version of Dexilant. The agreement also constitutes an

15  unlawful market allocation. The agreement substantially, unreasonably, and unduly restrained trade in

16  the relevant market, the purpose and effect of which was to delay the entry of AB-rated generic versions

17  of Dexilant and raise and maintain the prices that Plaintiff and the Class would pay for Dexilant to and

18  at supra-competitive levels.

19      247.    There is no legitimate, non-pretextual, procompetitive business justification for the

20  reverse payment agreement between Defendants.

21      248.    The agreement between Takeda and TWi harmed competition in the relevant market.

22      249.    Defendants' conduct violated the following state antitrust laws:

23          a.  Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*, with respect to purchases of brand and generic

24              Dexilant in Arizona by members of the Class.

25          b.  Cal. Bus. & Prof. Code § 16700, with respect to purchases of brand and generic

26              Dexilant in California by members of the Class.

27

28

c.  Conn. Gen. Stat. §§ 35-27, *et seq.*, with respect to purchases of brand and generic Dexilant in Connecticut by members of the Class.

d.  D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of brand and generic Dexilant in the District of Columbia by members of the Class.

e.  Haw. Rev. Stat. §§ 480-1, *et seq.* with respect to purchases of brand and generic Dexilant in Hawaii by members of the Class.

f.  Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.*, with respect to purchases of brand and generic Dexilant in Illinois by members of the Class.

g.  Iowa Code §§ 553.5 *et seq.*, with respect to purchases of brand and generic Dexilant in Iowa by members of the Class.

h.  Kan. Stat. Ann. §§ 50-101 *et seq.*, with respect to purchases of brand and generic Dexilant in Kansas by members of the Class.

i.  Me. Stat. tit. 10, §§ 1102, *et seq.*, with respect to purchases of brand and generic Dexilant in Maine by consumer members of the Class.

j.  Md. Code Ann., Com. Law §§ 11-204(a), *et seq.*, with respect to purchases of brand and generic Dexilant in Maryland by members of the Class.

k.  Mich. Comp. Laws §§ 445.773, *et seq.*, with respect to purchases of brand and generic Dexilant in Michigan by members of the Class.

l.  Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases of brand and generic Dexilant in Minnesota by members of the Class.

m.  Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of brand and generic Dexilant in Mississippi by members of the Class.

n.  Neb. Rev Stat. §§ 59-802, *et seq.*, with respect to purchases of brand and generic Dexilant in Nebraska by members of the Class.

o.  Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of brand and generic Dexilant in Nevada by members of the Class.

p.  N.H. Rev. Stat. Ann. §§ 356.11, *et seq.*, with respect to purchases of brand and generic Dexilant in New Hampshire by members of the Class.

q.  N.J. Stat. Ann. § 56:9 with respect to purchases of brand and generic Dexilant in New Jersey by members of the Class.

r.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of brand and generic Dexilant in New Mexico by members of the Class.

s.  N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of brand and generic Dexilant in New York by members of the Class.

t.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of brand and generic Dexilant in North Carolina by members of the Class.

u.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases brand and generic Dexilant in North Dakota by members of the Class.

v.  Or. Rev. Stat. §§ 646.730, et seq., with respect to purchases of brand and generic Dexilant in Oregon by members of the Class.

w.  50 R.I. Gen. Laws §§ 6-36-5 et seq., with respect to purchases of brand and generic Dexilant in Rhode Island by members of the Class.

x.  S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of brand and generic Dexilant in South Dakota by members of the Class.

y.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of brand and generic Dexilant in Tennessee by members of the Class.

z.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of brand and generic Dexilant in Utah by members of the Class.

aa. Vt. Stat. Ann. tit. 9, §§ 2453, et seq., with respect to purchases of brand and generic Dexilant in Vermont by consumer members of the Class.

bb. W. Va. Code §§ 47-18-4, et seq., with respect to purchases of brand and generic Dexilant in West Virginia by members of the Class.

cc. Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of brand and generic Dexilant in Wisconsin by members of the Class.

250.  Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Dexilant, and (2) paying higher prices for Dexilant and its generic equivalents than they would have paid in the absence of Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

251.  Plaintiff and the Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

## FIFTH CLAIM FOR RELIEF

### Unfair or Deceptive Trade Practices

252.  Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

253.  Defendants engaged in unfair competition, and/or unfair/unconscionable, and/or deceptive acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiff and Class members were deprived of the opportunity to purchase a less expensive generic version of Dexilant and forced to pay higher prices in violation of the following consumer protection statutes:

a.  Alaska Stat. §§ 45.50.471, *et seq.*, with respect to purchases in Alaska by members of the Class. Defendants engaged in unfair methods of competition and unfair practices in the conduct of trade and commerce.

b.  Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Class

members. There are no countervailing benefits to Class members and any utility of defendants' conduct is outweighed by the consequences to Class members.

   c.   Fla. Stat. §§ 501.201, *et seq*., with respect to purchases in Florida by members of the Class.

   d.   Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 505/1, *et seq*., with respect to purchases in Illinois by members of the Class.

   e.   Mass. Gen Laws ch. 93A §§ 1, *et seq*., with respect to purchases in Massachusetts by members of the Class.

   f.   Mo. Rev. Stat. §§ 407.020, *et seq*., with respect to purchases in Missouri by consumer members of the Class.

   g.   Mont. Code Ann. §§ 30-14-101, *et seq*., with respect to purchases in Montana by consumer members of the Class. Defendants engaged in unfair and deceptive acts and practices.

   h.   N.J. Stat. Ann. §§ 56:8-1 *et seq*., with respect to purchases in New Jersey by members of the Class.

   i.   S.C. Code Ann. §§ 39-5-20, *et seq.*, with respect to purchases in South Carolina by Class members. Defendants engaged in unfair methods of competition and unfair practices in the conduct of trade and commerce.

   j.   Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by consumer members of the Class. Defendants engaged in unfair methods of competition, unfair practices, and deceptive practices in the conduct of trade and commerce.

254.   Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair/unconscionable, and/or deceptive acts or practices alleged in this Count. Their injury consists of paying higher prices for brand and/or generic Dexilant than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

1

2

### SIXTH CLAIM FOR RELIEF

#### Unjust Enrichment

255.    Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

256.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

257.    As a result of their unlawful conduct described above, Defendants have and will continue to be, unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on brand and generic Dexilant.

258.    Defendants' financial benefits are traceable to Plaintiff's and Class members' overpayments for brand and generic Dexilant.

259.    Plaintiff and Class members have conferred, and continue to confer, an economic benefit upon Defendants in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiff and Class members.

260.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Class for brand and generic Dexilant manufactured by Defendants during the Class Period.

261.    It would be futile for Plaintiff and Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased brand or generic Dexilant, as those intermediaries are not liable and would not compensate Plaintiff and Class members for Defendants' unlawful conduct.

262.    The economic benefit Defendants derived from overcharging Plaintiff and Class members for brand and generic Dexilant is a direct and proximate result of Defendants' unlawful and anticompetitive practices.

263.     The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiff and Class members, who paid, and continue to pay, artificially inflated prices that inured to Defendants' benefit.

264.     It would be inequitable under unjust enrichment principles under the laws of the states described below for Defendants to retain any of the overcharges Plaintiff and Class members paid for brand and generic Dexilant that were derived from Defendants' unfair, anticompetitive, and unlawful methods, acts, and trade practices.

265.     Defendants are aware of and appreciate the benefits that Plaintiff and the Class members have bestowed upon them.

266.     Defendants should be ordered to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Class members, who collectively have no adequate remedy at law.

267.     A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received, which arise from overpayments for brand and generic Dexilant by Plaintiff and the Class members.

268.     Plaintiff and Class members have no adequate remedy at law.

269.     By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiff and Class members of the opportunity to purchase lower-priced generic versions of Dexilant and forced them to pay higher prices for brand and generic versions of Dexilant, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

### Alabama

270.     Defendants unlawfully overcharged end-payers who made purchases of or reimbursements for brand and generic Dexilant in Alabama at prices that were more than they would have been but for Defendants' actions.

271.     Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class

members. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

272.     Defendants have benefitted at the expense of Plaintiff and Class members from revenue resulting from unlawful overcharges for brand and generic versions of Dexilant.

### Alaska

273.     Defendants unlawfully overcharged end-payers who made purchases of or reimbursements for brand and generic Dexilant in Alaska at prices that were more than they would have been but for Defendants' actions.

274.     Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

275.     Defendants appreciated the benefits bestowed upon them by Plaintiff and Class members.

276.     Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

277.     Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

278.     Defendants have benefitted at the expense of Plaintiff and Class members from revenue resulting from unlawful overcharges for brand and generic versions of Dexilant.

### Arizona

279.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Arizona at prices that were more than they would have been but for Defendants' actions.

280.     Defendants have been enriched by revenue resulting from unlawful overcharges for brand and generic Dexilant.

281.     Plaintiff has been impoverished by the overcharges for brand and generic versions of Dexilant resulting from Defendants' unlawful conduct.

282.    Defendants' enrichment and Plaintiff's impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received from Plaintiff and Class Members.

283.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiff's impoverishment, because Plaintiff paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

284.    Plaintiff and Class members have no remedy at law.

### Arkansas

285.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Arkansas at prices that were more than they would have been but for Defendants' actions.

286.    Defendants received money from Plaintiff and Class members as a direct result of the unlawful overcharges and have retained this money.

287.    Defendants have paid no consideration to any other person in exchange for this money.

288.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

### California

289.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in California at prices that were more than they would have been but for Defendants' actions.

290.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

291.    Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class members.

CLASS ACTION COMPLAINT
CASE NO.:

**Colorado**

292.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Colorado at prices that were more than they would have been but for Defendants' actions.

293.    Defendants have received a benefit from Plaintiff and Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

294.    Defendants have benefitted at the expense of Plaintiff and Class members.

295.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**Connecticut**

296.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Connecticut at prices that were more than they would have been but for Defendants' actions.

297.    Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

298.    Defendants have paid no consideration to any other person in exchange for this benefit.

299.    Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class members.

**Delaware**

300.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Delaware at prices that were more than they would have been but for Defendants' actions.

301.    Defendants have been enriched by revenue resulting from unlawful overcharges for brand and generic Dexilant.

302.    Plaintiff and Class members have been impoverished by the overcharges for brand and generic Dexilant resulting from Defendants' unlawful conduct.

303. Defendants' enrichment and Plaintiff's impoverishment are connected.

304. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiff and Class members paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

305. Plaintiff and Class members have no remedy at law.

### Florida

306. Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Florida at prices that were more than they would have been but for Defendants' actions.

307. Plaintiff and the Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and the Class members.

308. Defendants appreciated the benefits bestowed upon them by Plaintiff and the Class members.

309. It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiff and the Class members.

### Georgia

310. Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Georgia at prices that were more than they would have been but for Defendants' actions.

311. Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

312. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**Hawaii**

313.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Hawaii at prices that were more than they would have been but for Defendants' actions.

314.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

315.    It is unjust for Defendants to retain the benefits received without compensating Plaintiff and Class members.

**Idaho**

316.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Idaho at prices that were more than they would have been but for Defendants' actions.

317.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

318.    Defendants appreciated the benefit conferred upon them by Plaintiff and Class members.

319.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**Illinois**

320.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Illinois at prices that were more than they would have been but for Defendants' actions.

321.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

CLASS ACTION COMPLAINT
CASE NO.:

322.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

323.    It is unjust and inequitable for Defendants to retain the benefits received without compensating Plaintiff and Class members.

**Iowa**

324.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Iowa at prices that were more than they would have been but for Defendants' actions.

325.    Defendants have been enriched by revenue resulting from unlawful overcharges for brand and generic Dexilant, which revenue resulted from anticompetitive prices paid by Plaintiff and Class members, which inured to Defendants' benefit.

326.    Defendants' enrichment has occurred at the expense of Plaintiff and Class members.

327.    It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Kansas**

328.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Kansas at prices that were more than they would have been but for Defendants' actions.

329.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

330.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

331.    Defendants were unjustly enriched at the expense of Plaintiff and Class members.

CLASS ACTION COMPLAINT
CASE NO.:

**Kentucky**

332.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Kentucky at prices that were more than they would have been but for Defendants' actions.

333.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

334.    Defendants appreciated the benefit conferred upon them by Plaintiff and Class members.

335.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**Louisiana**

336.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Louisiana at prices that were more than they would have been but for Defendants' actions.

337.    Defendants have been enriched by revenue resulting from unlawful overcharges for brand and generic Dexilant.

338.    Plaintiff and Class members have been impoverished by the overcharges for brand and generic Dexilant resulting from Defendants' unlawful conduct.

339.    Defendants' enrichment and Plaintiff's impoverishment are connected.

340.    There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiff and Class members paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

341.    Plaintiff and Class members have no other remedy at law.

**Maine**

342.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Maine at prices that were more than they would have been but for Defendants' actions.

343.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

344.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

345.    Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiff and Class members.

346.    Defendants were unjustly enriched at the expense of Plaintiff and Class members.

### Maryland

347.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Maryland at prices that were more than they would have been but for Defendants' actions.

348.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

349.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class members.

350.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

### Massachusetts

351.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Massachusetts at prices that were more than they would have been but for Defendants' actions.

352.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

CLASS ACTION COMPLAINT
CASE NO.:

353. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiff and Class members.

354. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members. Fairness and good conscience require that Defendants not be permitted to retain the revenue resulting from their unlawful overcharges at the expense of Plaintiff and Class members.

**Michigan**

355. Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Michigan at prices that were more than they would have been but for Defendants' actions.

356. Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

357. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

358. Defendants were unjustly enriched at the expense of Plaintiff and Class members.

**Minnesota**

359. Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Minnesota at prices that were more than they would have been but for Defendants' actions.

360. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiff and Class members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiff and Class members.

361. It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiff and Class members.

CLASS ACTION COMPLAINT
CASE NO.:

**Mississippi**

362. Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Mississippi at prices that were more than they would have been but for Defendants' actions.

363. Defendants retain the benefit of overcharges received on the sales of brand and generic versions of Dexilant, which in equity and good conscience belong to Plaintiff and Class members on account of Defendants' anticompetitive conduct.

**Missouri**

364. Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Missouri at prices that were more than they would have been but for Defendants' actions.

365. Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

366. Defendants appreciated the benefit bestowed upon them by Plaintiff and Class members.

367. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

**Montana**

368. Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Montana at prices that were more than they would have been but for Defendants' actions.

369. Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

370. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

CLASS ACTION COMPLAINT
CASE NO.:

**Nebraska**

371.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Nebraska at prices that were more than they would have been but for Defendants' actions.

372.    Defendants received money from Plaintiff and Class members as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.

373.    In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiff and Class members.

**Nevada**

374.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Nevada at prices that were more than they would have been but for Defendants' actions.

375.    Plaintiff and Class members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for brand and generic versions of Dexilant.

376.    Defendants appreciated the benefits bestowed upon them by Plaintiff and Class members, for which they have paid no consideration to any other person.

377.    Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiff and Class members.

378.    The circumstances under which Defendants have accepted and retained the benefits bestowed upon them by Plaintiff and Class members are inequitable in that they result from Defendants' unlawful overcharges for brand and generic Dexilant.

**New Hampshire**

379.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in New Hampshire at prices that were more than they would have been but for Defendants' actions.

380.    Defendants have received a benefit from Plaintiff in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

381.    Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

### New Jersey

382.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in New Jersey at prices that were more than they would have been but for Defendants' actions.

383.    Defendants have received a benefit from Plaintiff and Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

384.    The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to Plaintiff and Class members.

385.    Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiff and Class members with respect to Defendants' sales of brand and generic Dexilant.

386.    Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiff and Class members.

### New Mexico

387.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in New Mexico at prices that were more than they would have been but for Defendants' actions.

388.    Defendants have knowingly benefitted at the expense of Plaintiff and Class members from revenue resulting from unlawful overcharges for brand and generic versions of Dexilant.

389.    To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

### New York

390.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in New York at prices that were more than they would have been but for Defendants' actions.

391.    Defendants have been enriched by revenue resulting from unlawful overcharges for brand and generic Dexilant, which revenue resulted from anticompetitive prices paid by Plaintiff and Class members, which inured to Defendants' benefit.

392.    Defendants' enrichment has occurred at the expense of Plaintiff and Class members.

393.    It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

### North Carolina

394.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in North Carolina at prices that were more than they would have been but for Defendants' actions.

395.    Plaintiff and Class Members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

396.    Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

397.    The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Defendants' actions to delay entry of generic versions of Dexilant to the market.

CLASS ACTION COMPLAINT
CASE NO.:

398.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records and documents relating to Defendants' anticompetitive conduct.

399.   Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

<b>North Dakota</b>

400.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in North Dakota at prices that were more than they would have been but for Defendants' actions.

401.   Defendants have been enriched by revenue resulting from unlawful overcharges for brand and generic Dexilant.

402.   Plaintiff has been impoverished by the overcharges for brand and generic versions of Dexilant resulting from Defendants' unlawful conduct.

403.   Defendants' enrichment and Plaintiff's impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received directly or indirectly from Plaintiff and Class members.

404.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiff paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

405.   Plaintiff and Class members have no remedy at law.

<b>Oklahoma</b>

406.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Oklahoma at prices that were more than they would have been but for Defendants' actions.

407.   Defendants received money from Plaintiff and Class members as a direct result of the unlawful overcharges and have retained this money.

408.   Defendants have paid no consideration to any other person in exchange for this money.

CLASS ACTION COMPLAINT
CASE NO.:

409.    Plaintiff and Class members have no remedy at law.

410.    It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

411.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Oregon at prices that were more than they would have been but for Defendants' actions.

412.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

413.    Defendants were aware of the benefit bestowed upon them by Plaintiff and Class members.

414.    It would be inequitable and unjust for Defendants to retain any of the overcharges for brand and generic Dexilant derived from Defendants' unfair conduct without compensating Plaintiff and Class members.

**Pennsylvania**

415.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Pennsylvania at prices that were more than they would have been but for Defendants' actions.

416.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

417.    Defendants appreciated the benefit bestowed upon them by Plaintiff and Class members.

418.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**Rhode Island**

419.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Rhode Island at prices that were more than they would have been but for Defendants' actions.

420.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

421.    Defendants were aware of and/or recognized the benefit bestowed upon them by Plaintiff and Class members.

422.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**South Carolina**

423.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in South Carolina at prices that were more than they would have been but for Defendants' actions.

424.    The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges to Plaintiff and Class members.

425.    Defendants realized value from the benefit bestowed upon them by Plaintiff and Class members.

426.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**South Dakota**

427.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in South Dakota at prices that were more than they would have been but for Defendants' actions.

428.     Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

429.     Defendants were aware of the benefit bestowed upon them by Plaintiff and Class members.

430.     Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiff and Class members.

**Tennessee**

431.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Tennessee at prices that were more than they would have been but for Defendants' actions.

432.     Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

433.     Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class members.

434.     Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

435.     It would be futile for Plaintiff and Class members to exhaust all remedies against the entities with which Plaintiff and Class members have privity of contract because Plaintiff and Class members did not purchase brand or generic versions of Dexilant directly from any Defendant.

**Texas**

436.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Texas at prices that were more than they would have been but for Defendants' actions.

437.     Defendants have received a benefit from Plaintiff and Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

438.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class members.

439.   The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiff and Class members are inequitable in that they result from Defendants' unlawful overcharges for brand and generic Dexilant.

440.   Plaintiff and Class members have no remedy at law.

### Utah

441.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Utah at prices that were more than they would have been but for Defendants' actions.

442.   Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

443.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class members.

444.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

### Vermont

445.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Vermont at prices that were more than they would have been but for Defendants' actions.

446.   Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

447.   Defendants accepted the benefit bestowed upon them by Plaintiff and Class members.

448.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

CLASS ACTION COMPLAINT
CASE NO.:

**Virginia**

449.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Virginia at prices that were more than they would have been but for Defendants' actions.

450.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

451.    Defendants were aware of the benefit bestowed upon them.

452.    Defendants should reasonably have expected to repay Plaintiff and Class members.

453.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of brand and generic Dexilant.

454.    Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiff and Class members.

**Washington**

455.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Washington at prices that were more than they would have been but for Defendants' actions.

456.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

457.    Defendants were aware of or appreciated the benefit conferred upon them by Plaintiff and Class members.

458.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

CLASS ACTION COMPLAINT
CASE NO.:

**West Virginia**

459.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in West Virginia at prices that were more than they would have been but for Defendants' actions.

460.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

461.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class members.

462.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**Wisconsin**

463.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Wisconsin at prices that were more than they would have been but for Defendants' actions.

464.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

465.    Defendants appreciated the benefit bestowed upon them by Plaintiff and Class members.

466.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

**Wyoming**

467.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Wyoming at prices that were more than they would have been but for Defendants' actions.

CLASS ACTION COMPLAINT
CASE NO.:

468.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

469.    Defendants accepted, used, and enjoyed the benefits bestowed upon them by Plaintiff and Class members.

470.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Class members.

### District of Columbia

471.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in the District of Columbia at prices that were more than they would have been but for Defendants' actions.

472.    Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

473.    Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class members.

474.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

### Puerto Rico

475.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for brand and generic Dexilant in Puerto Rico at prices that were more than they would have been but for Defendants' actions.

476.    Defendants have been enriched by revenue resulting from unlawful overcharges for brand and generic Dexilant.

477.    Plaintiff has been impoverished by the overcharges for brand and generic versions of Dexilant resulting from Defendants' unlawful conduct.

478.    Defendants' enrichment and Plaintiff's impoverishment are connected.

CLASS ACTION COMPLAINT
CASE NO.:

479.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiff's impoverishment, because Plaintiff paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

480.    Plaintiff and Class members have no remedy at law.

## XIII.   ADEQUATE REMEDIES AT LAW

481.    To the extent that equitable relief is sought under any of the above claims, Plaintiff pleads such claims in the alternative to any legal claims and further plead that their legal claims do not provide adequate remedies at law. Until discovery and other pretrial matters are complete, the extent to which the legal claims above may provide the same relief for the same harms as could be available under claims providing equitable relief is unknown. Restitution may, for example, be measured differently than legal damages and provide for a different amount of relief. The difference between the value of restitution and legal relief will therefore be unknown until, at the earliest, the completion of expert reports and discovery.

## XIV.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that this Court:

a) Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and appoint Plaintiff as the named representative of the Class;

b) Award Plaintiff and the Class damages (i.e., three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

c) Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

d) Permanently enjoin Defendants both from continuing the unlawful conduct alleged here, and from engaging in similar or related conduct in the future;

CLASS ACTION COMPLAINT
CASE NO.:

e) Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy the Defendants' unjust enrichment;

f) Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

g) Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XV. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

DATED: April 25, 2025                    Respectfully submitted,

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**

/s/ *Stacey M. Kaplan*
Stacey M. Kaplan (Bar. No. 241989)
skaplan@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Joseph H. Meltzer (*pro hac vice* forthcoming)
jmeltzer@ktmc.com
Darren J. Check (*pro hac vice* forthcoming)
dcheck@ktmc.com
Terence S. Ziegler (*pro hac vice* forthcoming)
tziegler@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

**MILLER LAW LLC**
Marvin A. Miller (Bar No. 1916769)
mmiller@millerlawllc.com

Lori A. Fanning (*pro hac vice* forthcoming)
lfanning@millerlawllc.com
Kathleen Boychuck (*pro hac vice* forthcoming)
kboychuck@millerlawllc.com
53 W. Jackson Blvd., Suite 1320
Chicago, IL 60604
Telephone: 312-332-3400
Facsimile: 312-676-2676

***Counsel for Plaintiff and the Proposed Class***